**Jamie R. MADRIGAL, Petitioner,**

v.

**Margaret BAGLEY, Warden, Respondent.**

No. 1:02–CV–522.

United States District Court, N.D. Ohio, Eastern Division.

Aug. 5, 2003.

---

Susan M. Roche, Timothy R. Payne, Office of the Public Defender, Columbus, OH, for Petitioner.

Daniel Ranke, Office of the Attorney General, State of Ohio, Capital Crimes Section, Cleveland, OH, Heather L. Gosselin, Office of the Attorney General, State of Ohio, Capital Crimes Section, Columbus, OH, for Respondent.

## OPINION & ORDER

[Resolving Doc. 1]

GWIN, District Judge.

On March 19, 2002, Petitioner Jamie R. Madrigal ("Madrigal") petitioned this Court for a writ of habeas corpus under 28 U.S.C. § 2254. In seeking relief in this death penalty case, Petitioner Madrigal says that constitutional error attended his conviction and resulting death penalty sentence.

Although Madrigal states various grounds for relief, he principally claims that the state-court denied him his constitutional right of confrontation when it allowed the admission of two out-of-court statements by a co-defendant who refused to testify at trial. With those out-of-court statements, the co-defendant denied culpability and instead implicated Madrigal as the killer. The co-defendant Chris Cathcart's testimony was important. The identity of the killer was the principal issue at trial and some evidence suggested that the co-defendant Cathcart was the killer.

Reviewing this denial of a right to cross-examine evidence offered against him, the Ohio Supreme Court found the trial court erred but found the error harmless. Madrigal challenges this finding. He says much evidence suggested that the co-defendant, not Madrigal, was the killer. He argues that the trial court's error in admitting the implicating statement was significant to his conviction.

Respondent Warden Margaret Bagley ("Bagley") denies that Petitioner Madrigal is entitled to a writ of habeas corpus. First, Respondent Bagley maintains that Madrigal procedurally defaulted many of his claims for relief. Regarding the remaining claims, Bagley argues that Ma-

drigal fails to show any constitutional violations. Alternatively, she argues that Madrigal raises claims not cognizable in federal habeas review.

In this decision, the Court first describes the factual background of Madrigal's crime.[1] Then, the Court describes Madrigal's direct appeal and his later efforts at state-afforded post-conviction relief. The Court then discusses whether Madrigal exhausted his state court remedies and whether Madrigal defaulted certain claims under state procedural rules. Finally, the Court substantively reviews Madrigal's claims that had not otherwise been defaulted.

All, save one, of Madrigal's arguments fail. The Court finds that the admission of co-defendant Chris Cathcart's statements that implicated Madrigal as the killer "had a substantial and injurious effect or influence in determining the jury's verdict." The Court grants the petition for habeas corpus for the reasons that follow.

### I. Factual Background

On Friday, April 12, 1996, a robber killed Misty Fisher at a Kentucky Fried Chicken restaurant ("KFC") in Toledo. During that evening, Misty Fisher, Eric Armstrong, Brian Conley, and Carrie Tracy worked at the KFC. Tracy was sixteen years old. Misty Fisher, Eric Armstrong and Brian Conley were eighteen years old. Fisher and Armstrong were both closing managers.

Around 8:15 p.m. that Friday night, a black male entered the restaurant. Working at the front counter, Tracy asked the person if she could help him. He said "No, no." After looking around the restaurant, the black male exited.

At this time, Jeffrey Kerekes and Todd Corbett took their dinner break from work, and decided to go to the KFC for dinner. As they pulled into the drive-thru, they realized that the speaker was not working and they drove up to the window. Tracy came to the window to take their order.

At approximately the time that Kerekes and Corbett approached the drive-through window, the same black man who had previously been in the KFC returned. A loud crash caught everyone's attention as the man jumped over the counter, shattering the glass on the refrigerated counter case. After vaulting the counter, the man hit Armstrong in the head and ordered everyone to the floor. The man asked who the closing manager was. Armstrong said he was. The man then ordered Armstrong to get up and get the money out of all the registers. Armstrong responded and put the money in a KFC bag on the counter. The man then told Armstrong to open the safe, but Armstrong told him he did not have the combination. Armstrong told the robber that Fisher had the combination. The man grabbed Fisher by her ponytail and took both her and Armstrong to the area near the safe.

As they approached the safe, the robber told Armstrong to get to the floor, and ordered Fisher to open the safe. Fisher knelt in front of the safe, while the man held a gun to the back of her head. Afraid and nervous, Fisher told the robber she could not get the safe open. In response, the man barked, "hurry up bitch." Fisher asked Armstrong to help her, but as he got up, the man ordered him back to the floor. When Misty Fisher still could not get the safe open, the man said, "Now you're playing, bitch," and shot her in the back of the head. The man exited through the back

---

1. In stating the facts of Petitioner Madrigal's crime, the Court relies upon the Supreme Court of Ohio's description, provided in *State v. Madrigal*, 87 Ohio St.3d 378, 721 N.E.2d 52 (2000).

door. Armstrong immediately got up and called 911.

While this was going on, Corbett and Kerekes waited for their order. While waiting for their order, customers Corbett and Kerekes saw a man jump over the counter and hit Armstrong. They saw a chrome-plated gun in the man's hand. Realizing the man was robbing the KFC, they pulled through the drive-thru and drove around the front of the building. They noticed another man sitting on the driver's side of an older maroon Buick with chrome Cragar SS rims, parked against the back fence of the KFC parking lot. The car was backed into the parking spot, and had no license plate.

Corbett and Kerekes pulled around to the alley behind the KFC parking lot. Kerekes got out and looked through the bottom and top of the fence, looking for a license plate on the back of the car. He saw none.

Kerekes returned to his car, and he and Corbett drove to a 7–Eleven Store and asked the clerk to notify the police that a robbery was in progress at the KFC. They then went back to the KFC.

As they pulled into the parking lot, they noticed that the maroon Buick remained parked in the same spot; however, the man who had been in the car had now moved to the passenger seat.

After observing the maroon Buick, Corbett and Kerekes drove through the parking lot. As they came near to the back door, the door opened and a black man came out carrying a brown paper bag in his hands. The man stopped momentarily, looked at them, then got into the maroon car and took off. Corbett and Kerekes again went through the drive-thru lane. This time Tracy was hanging out the window screaming that someone had been shot.

Corbett and Kerekes went into the KFC as the police and ambulance were arriving. Although the police and ambulance had quickly arrived, Fisher died en route to the hospital from her gunshot wound.

Although Corbett and Kerekes gave the police a description of the car and the direction it headed, the police were unable to find it that night. The police took statements from Corbett and Kerekes and then took the three employee witnesses, Armstrong, Conley, and Tracy, to the police station. At the police station, the officers received the employees' statements. In their statements, the witnesses described the man as a black man, medium complexion, in his late teens or early twenties, medium build, short hair, wearing tan boots, a dark-colored hooded sweatshirt, and baggy pants. Kerekes described the baggy pants as jeans, while Tracy described them as brown "Dickies" brand pants with cuts on the legs.

The following day, Saturday, the police asked Corbett and Tracy to return to the police station to create a composite sketch to help generate leads in the case. Because of leads coming into the police station, the police arrested James Jordan.

On the Monday following the crime, the police asked the witnesses to come to the police station to participate in a lineup. Neither Corbett nor Kerekes picked anyone from the lineup. Tracy picked out Jordan, although she thought he was too short. She later said that she picked him only because she thought she was supposed to pick someone out.

Corbett and Kerekes identified a car type similar to the Buick they had seen. Police received a crime-stoppers tip that Jamie Madrigal had purchased such a car and the car was at a house on Alldays Street. On the Tuesday morning following the murder, Toledo police took Corbett to look at the vehicle at the Alldays address,

and Corbett identified it as the car he saw in the KFC parking lot. The police obtained a search warrant and seized the car.

After receiving leads that Cathcart had spent the night of the murder with Madrigal, officers then brought Cathcart in for questioning. Cathcart gave two extensive statements to the police, both implicating Madrigal in the robbery of the KFC and the murder of Fisher. In those statements, Cathcart said that he was the person in the car, while Madrigal went into the KFC and, by implication, committed Fisher's murder.

After Cathcart gave his statements, the police arrested him, issued an arrest warrant for Madrigal, and obtained a search warrant for the Alldays Street address. During the search of those premises, the police seized a pair of work boots, men's maroon pants, and a blue hooded sweatshirt.

Thursday morning, Boyd told police that Madrigal was in Cleveland. Evidently, Madrigal left Toledo in the early morning hours after the murder and went to the home of Rodney Pettiway (his half-brother) and Pettiway's girlfriend. He stayed there until early the following week. Madrigal saw the Toledo Blade newspaper at Pettiway's house and commented to Pettiway that "he wanted to get it." After his arrest, Madrigal contacted Pettiway from the county jail and asked him if he had "ratted him out."

FBI agents and Cleveland police executed the arrest warrant on Madrigal while he was at the house of Tavio Burton. Police forcibly entered through the back door of the house. The law enforcement officials arrested Madrigal and took him into the kitchen area, where they searched him and advised him of his rights.

Burton gave police a written consent to search the house. The police seized a cloth suitcase and duffel bag. They also found several pairs of brown "Dickie" pants, with the cuffs cut, in one bag. When police opened another bag, they found a nickel-plated revolver resting on top, and a bullet in the bag.

The police returned Madrigal to Toledo. They photographed him when they "booked" him and the police put together a photo array including Madrigal and five other black males. The police took the photos to Corbett, Kerekes, and Tracy to see if they could make an identification. Both Corbett and Tracy picked Madrigal's photograph out of the array. Kerekes did not pick out a photo, saying that he thought the quality of the photos was very poor. All three identified Madrigal in court.

The identity of the killer was the principal issue at trial. When the police arrested Madrigal, he had a mustache and a goatee. These features also appeared on his Ohio Identification Card, found in his coat pocket. Madrigal obtained the Ohio Identification Card several months before his arrest. When law enforcement officials interviewed the witnesses to the offense, none of the witnesses to the killing described the suspect as having a mustache or any facial hair.

During the investigation the police learned that both Madrigal and Cathcart had worked at the KFC that was robbed. They did not work at the KFC at the same time. Madrigal had worked the closing shift and knew the procedures for closing the store.

Law enforcement officials did not identify fingerprints taken at the KFC as those of Madrigal. Also, the state's firearm experts could not state with certainty that the gun seized during Madrigal's arrest was the murder weapon. But they also could not exclude it as the murder weapon.

At Madrigal's trial, co-defendant Cathcart asserted his Fifth Amendment right

against self-incrimination and refused to testify. However, the trial court admitted his statements into evidence, over defense objection.

The jury deliberated over eight hours before finding Madrigal guilty on all charges. The jury recommended that Madrigal be put to death, and the trial court adopted the jury's recommendation.

## II. Procedural Background

On May 13, 1996, the Lucas County grand jury indicted Madrigal, charging him with two counts: one count of aggravated murder with the death specification that the aggravated murder occurred during an aggravated robbery and one count of aggravated robbery. Each count of the indictment contained a firearm specification.

On October 7, 1996, Madrigal's trial began in the Lucas County Court of Common Pleas. The trial continued until October 22, 1996. On that date, the jury convicted Madrigal on all charges. After receiving the guilty verdicts, the trial court began the mitigation phase. On October 24, 1996, the jury recommended Madrigal be put to death. On November 25, 1996, the Lucas County Court of Common Pleas accepted the jury's recommendation and sentenced Madrigal to death.

On January 15, 1997, Madrigal appealed to the Ohio Supreme Court. On January 5, 2000, that court affirmed the conviction and sentence. *See State v. Madrigal,* 87 Ohio St.3d 378, 721 N.E.2d 52 (2000). Madrigal then moved the Ohio Supreme Court to reconsider its order. On February 16, 2000, the court denied the motion for reconsideration.

Madrigal sought review by the U.S. Supreme Court through a petition for a writ of certiorari. On October 2, 2000, the Supreme Court denied Madrigal's petition for certiorari.

After exhausting direct appeal, on September 21, 1998, Madrigal filed a post-conviction relief petition pursuant to section 2953.21 of the Ohio Revised Code, in the Lucas County Court of Common Pleas. On June 15, 1999, the common pleas court denied all but one of Madrigal's claims finding that "a hearing must be held on the evidence *dehors* the record in support of Ground Five." Madrigal's fifth ground for relief in the state post-conviction petition alleged ineffective assistance of counsel.

On September 17, 1999, the trial court conducted an evidentiary hearing upon Madrigal's claim that his trial counsel had been ineffective. On November 30, 1999, the trial court dismissed Madrigal's entire petition including ground five.

Madrigal appealed the trial court's decision to the Ohio Sixth District Court of Appeals. On November 17, 2000, the Sixth District appellate court affirmed the common pleas court's decision.

On December 28, 2000, Madrigal appealed the denial of post-conviction relief to the Ohio Supreme Court and filed a memorandum in support of jurisdiction. On March 21, 2001, the Ohio Supreme Court dismissed Madrigal's claim, finding that Madrigal's appeal did not involve any substantial constitutional question.

On March 19, 2002, Madrigal petitioned this Court seeking a writ of habeas corpus under 28 U.S.C. § 2254. The Court now considers Madrigal's petition.

## III. Exhaustion and Procedural Default

### A. Exhaustion

A habeas corpus petitioner must exhaust his state remedies before petitioning for a writ of habeas corpus. *See* 28 U.S.C. § 2254(b). To determine whether the petitioner has met the exhaustion requirement, the Court examines whether the petitioner "has the right under the law of the

State to raise, by any available procedure, the question presented." 28 U.S.C. § 2254(c).

As explained above, Madrigal has pursued all opportunities for relief at the state level, both on direct appeal and in post-conviction proceedings. Madrigal has exhausted all state remedies.

### B. Procedural Default

Federal courts "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson,* 501 U.S. 722, 729, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). As applied in the habeas context, this doctrine stops federal courts from reviewing claims that a state court has declined to address because of a petitioner's noncompliance with a state procedural requirement. *See Wainwright v. Sykes,* 433 U.S. 72, 87, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). "In these cases, the state judgment rests on independent and adequate state procedural grounds." *Thompson,* 501 U.S. at 730, 111 S.Ct. 2546.

■ The Sixth Circuit uses a four-step analysis to determine whether a claim has been procedurally defaulted. *See Maupin v. Smith,* 785 F.2d 135 (6th Cir.1986). Under this test, the Court determines: (1) whether the petitioner failed to comply with an applicable state procedural rule; (2) whether the state courts actually enforced the state procedural sanction; (3) whether the state procedural bar is an "independent and adequate" state ground on which the state can foreclose federal review, and if the previous elements are met; (4) whether the petitioner has demonstrated "cause" and "prejudice." *See id.* at 138–39.

Bagley contends that Madrigal procedurally defaulted on six of his fifteen claims for relief. Specifically, she says that Madrigal procedurally defaulted in part on Claim 11, and in whole on Claims 2, 5, 9, 12, and 15. Bagley acknowledges that there is no procedural default bar to consideration of Claims 1,3–4, 6–8, 10, 13–14, and portions of Claim 11. The Court considers each of these arguments in turn.

### 1. Claims Never Presented to State Courts: Claims 2 & 15

Madrigal's second claim contends that the trial court violated his constitutional rights when it denied his request for a lesser included offense instruction. With Claim 15, Madrigal alleges that he is actually innocent of capital murder. Bagley says Madrigal never raised Claims 2 and 15 in state court. Instead, Bagley asserts that Madrigal raised these claims for the first time in his federal habeas corpus petition.

Ordinarily, issues raised for the first time in a habeas corpus petition are remanded to the state court. However, Madrigal is barred from presenting these arguments in state court because he had the opportunity to raise them during his state court proceedings but failed to do so. *See Riggins v. McMackin,* 935 F.2d 790, 793 (6th Cir.1991) ("A state prisoner generally must first give the state courts a fair opportunity to remedy any constitutional infirmity in the conviction before seeking relief in a federal court."); *State v. Perry,* 10 Ohio St.2d 175, 179, 226 N.E.2d 104, 107 (1967) (holding that Ohio courts cannot consider a constitutional issue in post-conviction proceedings when that issue already had been or could have been fully litigated before judgment of conviction or on direct appeal from that judgment).

■ As a procedural matter, Ohio courts do not consider state or federal claims which were not timely asserted in State court proceedings. *State v. Perry,* 10 Ohio St.2d 175, 226 N.E.2d 104 (1967). In *Perry,* the Ohio Supreme Court held that constitutional issues cannot be consid-

ered in post-conviction proceedings where the issues could have been fully litigated by the prisoner while represented by counsel, either before his judgment of conviction or on direct appeal from that judgment, and thus have been adjudicated against him. *Id.* at syl. para. 7.[2] The *Perry* res judicata rule causes a procedural default when a defendant fails to raise an issue upon direct appeal. *See Wainwright,* 433 U.S. at 87, 97 S.Ct. 2497.

■ Here, Madrigal concedes that he did not raise Claim 2 in the state court upon direct appeal. Further, Madrigal had counsel both during the trial and on direct appeal. David Klucas and John Thebes defended Madrigal during the trial. Klucas and Thebes are certified to try capital cases in Ohio. On direct appeal, Jeffrey Gamso and James VanDeilen represented Madrigal. Because Madrigal had the opportunity to raise these claims in state court, but failed to do so, Ohio law establishes a procedural bar to these claims, absent a showing of cause and prejudice. *See Riggins,* 935 F.2d at 793.

### a. Fundamental Miscarriage of Justice & Actual Innocence

Madrigal admits that he did not raise Claim 2 in state court. Madrigal does not allege cause and prejudice exist to overcome the procedural default. Instead, he says that the claim is not barred by the principles of procedural default because he meets the fundamental miscarriage of justice standard.

■ A finding of procedural default stops habeas corpus relief, unless the petitioner can show cause for the default and actual prejudice. *Thompson,* 501 U.S. at

749–50, 111 S.Ct. 2546. A petitioner can also overcome procedural default if he can show that a failure to review his claims on their merits would be a fundamental miscarriage of justice. *See Murray v. Carrier,* 477 U.S. 478, 496, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986); *Coleman v. Mitchell,* 244 F.3d 533, 540 (6th Cir.2001).

To establish a fundamental miscarriage of justice based on actual innocence, "the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Schlup v. Delo,* 513 U.S. 298, 327, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). Further, the court must "assess the probative force of the newly presented evidence in connection with the evidence of guilt adduced at trial." *Schlup,* 513 U.S. at 332, 115 S.Ct. 851.

While Madrigal raises the issue that the Court's failure to review his procedurally defaulted claims would work a fundamental miscarriage of justice, Madrigal does not show evidence to make the required showing under *Schlup.* With respect to his claim that the trial court should have given a lesser included offense instruction, Madrigal offers no new evidence in support of his actual innocence claim. Instead, he argues that failing to instruct the jury on the lesser included offense "has probably resulted in the conviction of one who is actually innocent" of the crime charged.

■ "Without any new evidence of innocence, even the existence of a concededly meritorious constitutional violation is not in itself sufficient to establish a miscarriage of justice that would allow a habeas

---

**2.** In *State v. Cole,* 2 Ohio St.3d 112, 443 N.E.2d 169 (1982), the Ohio Supreme Court modified *Perry* to allow new claims, not previously raised, when the same trial counsel represents the defendant upon direct appeal. When different counsel represent the defen-

dant upon appeal, res judicata continues to bar claims that were apparent on the face of the record. Madrigal was represented by different counsel upon direct appeal and the failure to give a lesser included offense instruction was apparent upon the record.

court to reach the merits of a barred claim." *Schlup,* 513 U.S. at 316, 115 S.Ct. 851. "To be credible, such a claim [an actual innocence claim] requires petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324, 115 S.Ct. 851. An actual innocence claim "must be based on 'new reliable evidence.'" *Simpson v. Jones,* 238 F.3d 399, 407 (6th Cir.2000) (quoting *Schlup,* 513 U.S. at 324, 115 S.Ct. 851). Therefore, because Madrigal fails to offer new evidence in support of his actual innocence claim as it relates to Claim 2, the claim fails.

■ Even if Madrigal had not procedurally defaulted Claim 2, the claim fails on the merits. The imposition of the death penalty is unconstitutional where a "jury [is] not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." *Beck v. Alabama,* 447 U.S. 625, 627, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). However, an instruction on a lesser included offense is required only where the evidence presented at trial reasonably supports both an acquittal on the crime charged and a conviction on the lesser included offense. *Schmuck v. United States,* 489 U.S. 705, 716 n. 8, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989). A court need not give an instruction every time "some evidence" is presented on a lesser included or inferior degree offense. *State v. Shane,* 63 Ohio St.3d 630, 632–33, 590 N.E.2d 272 (1992).

Involuntary manslaughter, Ohio Rev. Code Ann. § 2903.04, is a lesser included offense of aggravated murder with prior calculation and design, Ohio Rev.Code Ann. § 2903.01(A), aggravated felony murder, Ohio Rev.Code Ann. § 2903.01(B), and murder, Ohio Rev.Code Ann. § 2903.02.

*State v. Thomas,* 40 Ohio St.3d 213, 533 N.E.2d 286, syl. ¶ 1 (1988). As a lesser offense of these forms of murder, involuntary manslaughter is distinguished by the mental state involved in the act. *See Thomas,* 40 Ohio St.3d at 216, 533 N.E.2d 286. "It is manifestly obvious that these two [mental] states are mutually exclusive and that in any given killing the offender may be possessed of only one." *Id.* (citing *State v. Johnson,* 6 Ohio St.3d 420, 453 N.E.2d 595 (1983)). Unlike murder, the offense of involuntary manslaughter does not require a showing of purpose or prior calculation and design. *Id.* at 216–17, 533 N.E.2d at 289–90.

■ Here, the trial court did not err in failing to give the jury an involuntary manslaughter instruction. No sufficient evidence suggests that the shooting of Fisher was accidental or unplanned. Eric Armstrong testified that the robber shot Fisher point-blank in the head after she could not open the safe. Tr. Vol. VI (Trial), at 1175. This type of shooting reflects prior calculation and design. *See State v. Goodwin,* 84 Ohio St.3d 331, 344–45, 703 N.E.2d 1251, 1263 (1999) (holding that shooting in the head at point-blank range showed that the defendant killed the victim purposely despite defendant's claim that the "gun just went off"). Further support for the purposefulness of the murder comes from Armstrong's testimony that as the robber shot Fisher, he proclaimed, "Now you're playing, bitch." Tr. Vol. VI (Trial), at 1174–75.

At trial the parties disputed the identity of the shooter, not whether the shooter purposefully killed Fisher. "[A]n instruction on the lesser included offense of involuntary manslaughter will be given in a murder trial only when, on the evidence presented, the jury could reasonably find against the state on the element of purposefulness and still find for the state on

the defendant's act of killing another." *Thomas*, 40 Ohio St.3d at 216, 533 N.E.2d at 289. Accordingly, the trial evidence did not warrant an instruction on involuntary manslaughter even if Madrigal had not defaulted the claim.

■ As to claim 15, Madrigal makes a freestanding actual innocence claim. Such claims are not cognizable. *Herrera v. Collins*, 506 U.S. 390, 404, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993) ("[A] claim of 'actual innocence' is not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits."); *Appleman v. Turner*, 52 F.3d 324 (6th Cir.1995) ("petitioner's claim of actual innocence does not entitle him to habeas corpus relief absent an independent constitutional violation in the criminal proceeding"). The *Herrera* court further stated, in dicta, that an actual innocence claim might be cognizable "if there were no state avenue open to process such a claim." *Id.* at 417, 113 S.Ct. 853. The Supreme Court noted, however, that even if such a claim were cognizable, "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.* Madrigal does not make such a showing.

Even if the claim was cognizable, Madrigal offers no new evidence to support this claim. Instead, he rehashes his argument that "had the jury in this case been provided with defense counsel's requested instruction allowing for conviction of a lesser included offense, Petitioner may well not have been convicted of capital murder" when "Petitioner is innocent of capital murder." Therefore, Madrigal's freestanding actual innocence claim also fails.

### 2. Res Judicata

Next, Respondent Bagley argues that Claims 9, 11, and 12 are procedurally barred because the state court applied the doctrine of res judicata to dismiss the claims. In Claim 9, Madrigal asserts that his trial counsel denied him effective assistance when he failed to file a motion for a change of venue. With his eleventh claim, Madrigal complains that his trial counsel's ineffective performance deprived him of adequate mitigation. Claim 12 alleges prosecutorial misconduct.

■ Under Ohio law, an issue that is not raised by a petitioner on direct appeal is subsequently barred based on the doctrine of res judicata. *See, e.g., State v. Combs*, 100 Ohio App.3d 90, 97, 652 N.E.2d 205, 209 (Ohio Ct.App.1994) (holding that res judicata stops post-conviction relief for claims that could have been raised on direct appeal); *Perry*, 10 Ohio St.2d at 175–76, 226 N.E.2d at 105–06 (syl.). Courts consider such issues waived for federal habeas purposes. *See Norris v. Schotten*, 146 F.3d 314, 332 (6th Cir.1998) (quoting *Rust v. Zent*, 17 F.3d 155, 160 (6th Cir. 1994)).

■ But "where a state appellate court did not rely on the procedural default, but reached the merits of a claim, the [procedural] bar is inapplicable." *Meeks v. Bergen*, 749 F.2d 322, 325 (6th Cir.1984).

The Court examines each claim below to determine if the procedural bar applies.

#### a. Claim 9—Failure to Move for Change of Venue

■ With his ninth claim, Madrigal asserts that his trial counsel denied him effective assistance when he failed to file a motion for a change of venue. Madrigal first raised this claim in his post-conviction relief motion. The trial court reviewing the post-conviction petition found the res judicata doctrine barred the claim because Madrigal brought the claim for the first time in his post-conviction proceedings although he could have raised it on direct appeal. Alternatively, the trial court concluded that the claim failed on the merits.

The state appellate court affirmed the judgment of the Lucas County Common Pleas Court. The Ohio Supreme Court declined to exercise jurisdiction over Madrigal's subsequent appeal.

Respondent Bagley contends that the Ohio trial and appellate court's application of the state procedural bar stops the Court from considering this claim in federal habeas. Responding, Madrigal says that the trial court reached the merits of the claim instead of relying upon the res judicata doctrine. He further says that, even if the trial court did apply a procedural bar to the claim, the state appellate court did not enforce the procedural bar because the appellate court addressed the merits of the claim. Therefore, he claims that the state does not meet the second prong of the *Maupin* test.

Madrigal is partially correct. The Lucas County Common Pleas Court did deny Madrigal's claim on the basis of res judicata. It said "Original appellate counsel has [sic] the opportunity to raise this matter on appeal. Even if the claims were not barred by *res judicata,* they would fail." In accordance with its alternative holding, it then discussed the voir dire proceedings and concluded that "insufficient evidence of prejudice exists on the claim that Madrigal's attorneys should have requested a change of venue." *State v. Madrigal,* No. CR96–5761, *15 (Ct. Common Pleas, Lucas Co. June 15, 1999). The trial court's alternative holding on the merits does not stop the application of the procedural bar. The trial court clearly stated that its merits examination was an alternative holding. *Harris v. Reed,* 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) (noting that a federal court need not reach the merits of a habeas petition where the last state-court opinion clearly and expressly rested upon procedural default as an alternative ground).

However, the Ohio appellate court, the last state court rendering a judgment, did not clearly and expressly apply the res judicata doctrine to the claim.

In his appeal to the state appellate court of the denial of his post-conviction petition, Madrigal made two separate claims. First, he challenged the trial court's dismissal of his petition without an evidentiary hearing. With this claim, Plaintiff Madrigal says he presented sufficient facts to require a hearing. He also objected to the trial court's finding that res judicata stopped his claims. Specifically, he framed the issues as follows:

> Did the trial court err in dismissing a post-conviction Petition where it was supported by sufficient operative facts to merit an evidentiary hearing and discovery?

> Did the trial court err in applying the doctrine of res judicata to claims in a post-conviction Petition that were supported by evidence dehors the record?

App. to Return of Writ, Vol. VIII, (Post-conviction), Ex. 28 at 242.

In Ohio, courts may dismiss a post-conviction relief petition without an evidentiary hearing in two instances. First, courts may dismiss such a petition without an evidentiary hearing where the res judicata doctrine stops the claims. *Perry,* 10 Ohio St.2d 175, 226 N.E.2d 104. "To overcome the res judicata bar, the evidence offered dehors the record must demonstrate that the petitioner could not have appealed the constitutional claim based upon information in the original [trial] record." *State v. Lawson,* 103 Ohio App.3d 307, 659 N.E.2d 362, 367 (Ohio Ct.App.1995) (citation omitted). Therefore, in analyzing whether a trial court properly applied the res judicata doctrine, reviewing courts look to see if the petitioner's evidence is new evidence that was unavailable in the original decision.

More generally, even when the doctrine of res judicata does not apply, Ohio Rev. Code Ann. § 2953.21(C) allows courts to dismiss a petition without an evidentiary hearing if no substantive grounds for relief exist. In pertinent part, Ohio Rev.Code Ann. § 2953.21(C) states:

*Before granting a hearing on a petition filed under division (A) of this section, the court shall determine whether there are substantive grounds for relief.* In making such a determination, the court shall consider, in addition to the petition, the supporting affidavits, and the documentary evidence, all the files and records pertaining to the proceedings against the petitioner, including, but not limited to, the indictment, the court's journal entries, the journalized records of the clerk of the court, and the court reporter's transcript. The court reporter's transcript, if ordered and certified by the court, shall be taxed as court costs. If the court dismisses the petition, it shall make and file findings of fact and conclusions of law with respect to such dismissal.

Ohio Rev.Code Ann. § 2953.21(C) (emphasis added).

In contrast to the res judicata review, section 2953.21(C) requires the state appellate court to determine if the trial court erred in determining that substantive grounds for relief did not exist. Here, the appellate court's discussion resolving Madrigal's ninth claim blurs the res judicata and substantive merits analyses. On the one hand, the state court of appeals acknowledges that Madrigal challenges the post-conviction relief court's application of the res judicata doctrine:

Appellant next argues that he received ineffective assistance of trial counsel because his attorneys did not ask for a change of venue after conducting voir dire. He says every juror had knowl-edge of the case prior to trial because of their exposure to media coverage.

*He argues that the trial court erred when it ruled that res judicata applied because he could have raised the issue on direct appeal. He says that he could not litigate this issue on direct appeal because his argument relies on evidence outside the record.* He points to the evidence outside the record that he did file. The evidence includes an affidavit from his stepfather who averred that he heard a radio disc jockey from 92.5 FM say "burn the nigger" when commenting on appellant's trial and copies of all the articles that appeared in the *Toledo Blade* relating to the robbery and murder, the description of the suspect sought by the police and appellant's arrest and indictment. He says that he could not get a fair and impartial jury because of the extensive media coverage and that his trial was prejudiced because his trial attorneys did not seek a change of venue.

App. to Return of Writ, Vol. VIII, (Post-conviction), Ex. 31 at 488.

But then the appellate court reviewing the post-conviction court's decision appears to reach the merits of the claim. Specifically, the appellate court examines both the *voir dire* evidence in the record and the evidence *dehors* the record, concluding that this evidence did not show that pre-trial publicity had prejudiced Madrigal from getting a fair trial:

While the evidence dehors the record offered by appellant in this case certainly does provide more detail regarding the content of the media coverage of: 1) the crime; 2) the search for a suspect; and 3) appellant's arrest and arraignment than the trial record showed, it does not, as appellant asserts, *show that he was prejudiced from having a fair trial.* While some jurors indicated that

they did have some memory of reports about a robbery and murder at a Kentucky Fried Chicken restaurant, all of the jurors selected indicated that they could set aside all that they learned through media coverage and could base their verdict solely on the evidence heard at trial. Accordingly, the trial court did not err when it ruled that the evidence dehors the record was not sufficient to warrant an evidentiary hearing on the question of whether the appellant received ineffective assistance of counsel when his attorneys did not seek a change of venue due to pretrial publicity.

App. to Return of Writ, Vol. VIII, (Post-conviction), Ex. 31 at 489–90 (emphasis added).

As discussed, the standard for res judicata is whether, on direct appeal, the petitioner could have raised the issue with evidence available at the time of the direct appeal. The appellate court's language does not directly address that standard. Instead, the appellate court's language suggests that it gave substantive consideration to the claim.

The appellate court's treatment of Madrigal's other claims supports a finding that the appellate court gave substantive, not solely procedural, consideration of the change of venue claim. In rejecting Madrigal's ineffective assistance claim relating to his trial counsel's failure to object to a misleading jury instruction during the mitigation hearing, the appellate court clearly applies the res judicata standard:

> Both of the exhibits referred to by appellant as essential proof outside the record present intellectual arguments *that could have been argued on direct appeal. Therefore, the exhibits were not substantial evidence that triggered an obligation on the part of the trial court to hold an evidentiary hearing on this claim.*

App. to Return of Writ, Vol. VIII., (Post-conviction), Ex. 31 at 492. The appellate court then goes on to say that its merits holding is alternative, "in any event, appellant's claim for ineffective assistance of counsel on that basis [the substantive merits] fails." App. to Return of Writ, Vol. VIII., (Post-conviction), Ex. 31 at 493. Regarding Madrigal's ineffective assistance claim relating to the failure to move for a change of venue, the reliance upon the procedural default is not apparent.

Finally, besides confusing the res judicata and substantive merit analyses, the appellate court makes no plain statement that it is resting its decision on the procedural bar. *Harris* extended the "plain statement" rule of *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), to federal habeas corpus review. *Harris,* 489 U.S. at 263, 109 S.Ct. 1038. Under *Harris,* "a procedural default does not bar consideration of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Id.* (citing *Caldwell v. Mississippi,* 472 U.S. 320, 327, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (quotation omitted) (emphasis added)).

The state court inferred that its holding was based on the procedural bar by mentioning Madrigal's res judicata argument. Nonetheless, the appellate court avoids explicit reliance on a state procedural bar. Further, the state appellate court appears to reject the federal ineffective assistance claim on the merits. And in doing so, it appears to have interwoven federal law with state law. "[T]he Harris presumption is to be applied only after it has been determined that 'the relevant state court decision ... fairly appear[s] to rest primarily on federal law or is interwoven with [federal] law.'" *Ylst v. Nunnemaker,* 501

U.S. 797, 802, 111 S.Ct. 2590, 115 L.Ed.2d 706 (1991) (quoting *Coleman*, 111 S.Ct. at 2559). As a result, the reference to res judicata is insufficient to show the court intended to principally rely upon res judicata in dismissing the claim. *See Long*, 463 U.S. at 1040–1041, 103 S.Ct. 3469.

In sum, the appellate court's decision is ambiguous as to whether it rested its decision on the procedural bar. It made no plain statement that the procedural bar caused its decision. Since the state appellate court did not "clearly and expressly" state that its judgment rested on the state procedural bar and since its analysis involves both state and federal law, Madrigal's claim 9 is ripe for federal habeas review.

### b. Claim 11—Ineffective Assistance of Counsel at Mitigation

■ Madrigal's eleventh claim asserts that he had inadequate representation at the mitigation stage. He argues that his two defense attorneys should have requested more time to investigate his background; presented more witnesses during mitigation; prepared the witnesses better; hired different expert witnesses; and let him decide the dispute his counsel had over presentation of mitigation witnesses.

Respondent Bagley responds that portions of this claim cannot be raised in a federal habeas proceeding because they were procedurally defaulted when the Ohio appellate court applied the res judicata procedural bar. Specifically, she says that Madrigal's ineffective assistance of counsel claims regarding the failure to request a continuance, failure to object to prosecutorial misconduct during the mitigation phase, and deficient performance during the mitigation phase are procedurally barred. As to other arguments in claim 11, Bagley concedes that the remaining arguments are not procedurally barred.

Madrigal argues that the claim was not procedurally defaulted because, while the state court discussed res judicata in connection with several of his other subclaims, both the trial court and the state court of appeals addressed the merits of Madrigal's eleventh claim.

Madrigal is partially correct. While the trial court applied the res judicata doctrine to stop Madrigal's claims, *see State v. Madrigal*, No. CR96–5761, *12 ("Even if the claims were not barred by res judicata, they would fail."), the appellate court made no "plain statement" that its decision rested on the state procedural bar.

First, in addressing Madrigal's claim that his attorney rendered deficient performance during the mitigation hearing, the appellate court made no mention of the trial court's use of the res judicata doctrine to stop this claim. In contrast, the appellate court expressly mentions the res judicata doctrine in connection with other of Madrigal's claims. Instead, the court of appeals addressed the substantive merits of the ineffective assistance claim, stating:

> Appellant also argues that the trial court erred when it ruled he was not entitled to an evidentiary hearing on his claims of ineffective assistance of counsel relating to the mitigation hearing portion of his trial. . . . Appellant says that he presented sufficient evidence outside of the record to show that relevant information about his background was not discovered or presented at trial. He argues that the jury was given such an incomplete picture of his childhood, it could not reasonably decide if the mitigating evidence outweighed the aggravating circumstances of the crime.
>
> *He says his trial counsel fell below an objective standard of reasonable representation* because they did not completely investigate his background and did not adequately prepare the witnesses they did call on his behalf during the mitigation hearing. *He says his case*

*was prejudiced,* since his trial attorneys had the chance to do the most good for him during the mitigation phase of the trial.

App. to Return of Writ, Vol. VIII, (Post-conviction), Ex. 31 at 482–83 (emphasis added).

After reciting the federal ineffective assistance of counsel standard, the appellate court discussed Madrigal's evidence outside the trial court record and the trial court's treatment of it:

> The trial court ruled that the additional information offered by appellant's relatives through affidavits was merely cumulative to the testimony that the jury heard during the mitigation portion of appellant's trial. The court also said that the additional information about appellant's dismal upbringing was of questionable mitigating value. *The trial court concluded that there was no substantial evidence to show either that the representation provided by appellant's trial counsel fell below an objective standard of reasonable representation or that appellant was prejudiced by the representation. The trial court therefore dismissed the claim without granting appellant an evidentiary hearing on the issue.*

App. to Return of Writ, Vol. VIII, (Post-conviction), Ex. 31 at 484 (emphasis added).

> Finally, the appellate court concluded:

> Our own careful review of the record and of the affidavits presented by appellant in support of his petition for post-conviction relief has led us to the same conclusions reached by the trial court. While the trial transcript does show that appellant's stepparents were not as forthcoming as they might have been concerning the details of the difficulties appellant faced while growing up, the jury was provided with information that showed appellant's upbringing was less

than ideal.... *like the trial court, we conclude that the evidence outside the record is only cumulative of the evidence that was presented to the jury, and that appellant was not prejudiced by his trial counsel's failure to present the further evidence since it still would not have outweighed the aggravating circumstances of the crime.... Therefore, appellant's arguments that he received ineffective assistance of counsel relating to the mitigation hearing portion of his trial are not well-taken.*

App. to Return of Writ, Vol. VIII., (Post-conviction), Ex. 31 at 487 (Emphasis added).

Nowhere in this discussion does the court mention res judicata or the standards that the reviewing courts apply to a trial court's application of the res judicata doctrine.

Therefore, since the last state court to render a judgment did not clearly and expressly apply the res judicata doctrine, Madrigal did not procedurally default the portions of claim 11 relating to his attorneys' failure: 1) to request more time to investigate his background; 2) to present more witnesses during mitigation; 3) to adequately prepare the witnesses; 4) to hire a competent expert witness; and 5) to let him decide a dispute they had over presentation of mitigation witnesses.

However, Madrigal did procedurally default a portion of claim 11 because he did not raise it in state courts. Specifically, he did not raise his claim that his attorney rendered ineffective assistance when he incongruously argued residual doubt as a mitigating factor while also expressing an unqualified acceptance of the jury's guilty verdict. Under Ohio's post-conviction statute, issues raised for the first time in post-conviction are procedurally defaulted on habeas corpus. *Engle v. Isaac,* 456 U.S.

107, 125 n. 28, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982).

### c. Claim 12—Prosecutorial Misconduct

For his twelfth claim, Madrigal argues that the prosecutor violated his constitutional rights by improperly arguing a nonstatutory aggravating factor of future dangerousness to the jury at mitigation. During the state post-conviction relief action, the trial court applied the res judicata rule to the claim. Alternatively, the court determined that the claim failed on the merits. The state appellate court affirmed the judgment of the Lucas County Common Pleas Court. The Ohio Supreme Court declined to exercise jurisdiction over Madrigal's subsequent appeal.

Respondent Bagley contends that the Court cannot consider this claim in a federal habeas action because Madrigal could have raised it on direct appeal. By failing to raise this issue on direct appeal, Bagley claims Madrigal procedurally defaulted the claim. Responding to this argument, Madrigal claims that the procedural bar does not apply because the appellate court's denial of the claim was based on its merits. Stated otherwise, Madrigal says the res judicata rule does not apply because the appellate court that reviewed the denial of post-conviction relief did not rely upon this argument.

During the post-conviction relief action, the trial court expressly applied the res judicata doctrine to Madrigal's claim, concluding that Madrigal "failed to demonstrate that most of his claims could not have been fully addressed on appeal based on the original record and therefore res judicata applies." *State v. Madrigal,* No. CR96–5761, *11. Besides its finding that res judicata applied to the claim, the Lucas County Common Pleas Court alternatively found that the claim failed on the merits. Specifically, the court addressed the comments made by the prosecutor in her closing argument. In its review, the trial court determined that "the Supreme Court of Ohio specifically allowed such comments to be made in closing argument" and "prosecutors are entitled to latitude as to what the evidence has shown and what inferences can reasonably be drawn from the evidence." *Id.*

■ When the state court reaches the merits of a claim, an alternative holding based on a procedural bar prevents federal courts from hearing the claim in a habeas corpus action, "as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision." *Reed,* 489 U.S. at 265 n. 10, 109 S.Ct. 1038. However, under the *Harris* rule, procedural default does not apply "unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Id.* at 263, 109 S.Ct. 1038. In this case, the last state court rendering a judgment was the appellate court. The state court of appeals reached the merits of Madrigal's claim that the prosecutor engaged in misconduct instead of clearly applying the state procedural bar. Specifically, the appellate court stated:

> *Likewise, appellant's argument that the prosecutor engaged in prejudicial misconduct is unpersuasive.* The record shows that appellant presented testimony that he adjusted well to prison life and argued that should be considered a mitigating factor. In closing argument, the prosecutor argued that appellant's adjustment to prison life was entitled to little weight in the view of the fact that he would still, at some point, be entitled to be released from prison if he did not receive the death penalty, and argued that he would still be dangerous because of his personality disorder. The Supreme Court of Ohio has said on at least two occasions that prosecutorial remarks regarding the future dangerousness of a

criminal are permissible in a rebuttal closing argument. [citations omitted]. *The future dangerousness of appellant was not presented as an aggravating factor to consider in the jury instructions. The trial court did not err when it ruled that appellant was not entitled to an evidentiary hearing on this claim.* App. to Return of Writ, Vol. VIII., (Post-conviction), Ex. 31 at 493–94 (Emphasis added). Further, the appellate court referenced the federal prosecutorial misconduct standard when it considered the prosecutor's discussion of future dangerousness. *See Smith v. Phillips,* 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Therefore, the appellate court's analysis is interwoven with federal law. Because the appellate court, the last court to make a reasoned decision, did not clearly and expressly rest its decision on the res judicata doctrine, Madrigal's twelfth claim is not procedurally barred.

### 3. Plain Error Review

As his fifth claim, Madrigal asserts the trial court's instruction on weighing aggravating and mitigating circumstances was unconstitutional. Therefore, he says his trial counsel rendered ineffective assistance of counsel when he failed to object to the weighing instructions.

In the post-conviction action, the trial court dismissed this claim based on the res judicata doctrine. The appellate court affirmed the dismissal based on the procedural bar. The Ohio Supreme Court conducted a plain error review and affirmed the lower state courts' decisions.

Respondent Bagley argues that Madrigal's fifth claim is procedurally defaulted because the Ohio Supreme Court rested its decision on a procedural bar though it also conducted a plain error review. Madrigal says that his trial counsel's ineffectiveness in failing to object to the improper instruc-

tion constitutes cause to excuse the procedural default.

Plain error review by a state appellate court does not open a claim to consideration on federal habeas when the state court otherwise finds the claim procedurally barred. *Paprocki v. Foltz,* 869 F.2d 281, 284–5 (6th Cir.1989). An ineffective trial counsel may be cause sufficient to excuse a procedural default, but the petitioner must show both cause and prejudice to excuse the default. *See Thompson,* 501 U.S. at 750–51, 111 S.Ct. 2546.

The two part *Strickland* analysis governs Sixth Amendment claims of ineffective assistance of counsel. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under this standard, to succeed on an ineffective assistance of counsel claim, a petitioner must show:

> First, ... that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

> The trial court instructed the jury:
> [I]f the aggravating circumstances outweigh the mitigating factors, your sentence should be death. **If the mitigating factors outweigh the aggravating circumstances,** then your verdict may

be life with parole eligibility after a term of twenty or thirty full years has been served. **If the mitigating factors outweigh the aggravating circumstances,** then your verdict shall be life with parole eligibility after a term of either 20 or 30 full years has been served.

Tr. Vol. XIII, (Mitigation & Sentencing) at 247–48 (Emphasis added). The instructions are not a correct statement of Ohio law. Ohio's death penalty statute does not require mitigating factors to outweigh aggravating circumstances before a jury may impose a life sentence. Instead, Ohio Revised Code section 2929.03(D)(2) provides that a jury shall impose a life sentence absent a finding that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.

■ Assuming that Madrigal's attorney was deficient in failing to object to the weighing instruction, Madrigal does not show prejudice. The erroneous instruction in Madrigal's case was harmless in light of numerous other correct instructions. This included at least four correct statements of the law in the jury charge. Notably, the trial court instructed the jury that "If you do not unanimously find that the aggravating circumstances outweigh the mitigating factors, you shall unanimously recommend ... a life sentence." Tr. Vol. XIII, (Mitigation & Sentencing) at 247–248. This instruction tells the jury their verdict should be for the defendant if they find that the aggravating and mitigating circumstances are in equipoise. Additionally, the jury verdict forms correctly stated the weighing procedure. Furthermore, the jury only deliberated for two hours before returning with a sentence, and at no time during their deliberations did they reflect that were having difficulty reaching a decision. After reviewing the instructions as a whole, the Court concludes that Madrigal's attorney's failure to object to the improper instruction did not deprive Madrigal of a fair trial whose result is reliable.

Accordingly, Madrigal does not establish prejudice sufficient to excuse the procedural default of his fifth claim.

In sum, the Court finds that Madrigal procedurally defaulted several of his claims. He does not establish cause and prejudice to excuse the default. He also fails to meet the miscarriage of justice standard. Therefore, the Court does not consider Claims 2, 5, and 15, and portions of Claim 11 on federal habeas review.

Upon review of the record, the Court finds that Madrigal properly preserved for federal habeas review Claims 1, 3–4, 6–10, portions of claim 11, and Claims 12–14. Accordingly, the Court turns to the merits of these claims.

IV. Standard and Analysis

A. Antiterrorism and Effective Death Penalty Act of 1996

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") prohibits a federal court reviewing a state court adjudication from granting a habeas petition unless the state court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C.A. § 2254(d)(1). Specifically, the AEDPA states:

(d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determina-

tion of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

All of Madrigal's claims include mixed questions of law and fact for which 28 U.S.C. § 2254(d)(1) provides the applicable standard of review. Further, for several of his claims, Petitioner Madrigal does not seek review of the state court's description of the applicable legal principles, but instead, that court's application of those principles to the facts of his case. Therefore, the Court considers those claims under § 2254(d)(1)'s "unreasonable application" clause.

The U.S. Supreme Court interpreted § 2254(d)(1) in *Williams v. Taylor*, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). "In determining whether a decision is contrary to or involved an unreasonable application of clearly established federal law," federal courts may only look to the "holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state-court decision." *Bulls v. Jones*, 274 F.3d 329, 333 (6th Cir.2001) (citing *Williams*, 529 U.S. at 412, 120 S.Ct. 1495 (2000)) (internal punctuation omitted).

A state court decision is "contrary to" clearly established federal law "if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases," or "if the state court confronts a set of facts that are materially indistinguishable from a [Supreme Court] decision ... and nevertheless arrives at a result different from [Supreme Court] precedent." *Id.* (quoting *Williams*, 529 U.S. at 405–06, 120 S.Ct. 1495).

A decision is an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's

case." *Id.* However, "the term 'unreasonable' is not synonymous with 'incorrect.'" *Schoenberger v. Russell*, 290 F.3d 831, 834 (6th Cir.2002) Therefore, "'a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.'" *Schoenberger*, 290 F.3d at 834 (quoting *Williams*, 529 U.S. at 411, 120 S.Ct. 1495). "Instead, the correct inquiry is 'whether the state court's application of clearly established federal law was objectively unreasonable.'" *Schoenberger*, 290 F.3d at 834 (quoting *Williams*, 529 U.S. at 410, 120 S.Ct. 1495).

## V. Grounds For Relief

The Court now reviews Petitioner Madrigal's grounds for relief. As explained below, the Court finds that, except for Claim 1, Madrigal fails to show that the state courts' determination of the facts in light of evidence presented was unreasonable or that the state courts' application of controlling law was unreasonable. As to his first claim, the Court finds that the Ohio Supreme Court's conclusion that the admission of co-defendant Chris Cathcart's statements did not have "a substantial and injurious effect or influence in determining the jury's verdict" was objectively unreasonable. The Court therefore grants Madrigal a writ of habeas corpus.

## ALLEGED TRIAL COURT ERRORS

With his petition, Madrigal makes six allegations of trial court errors (Claims 1–6). The Court examines each argument below.

### A. Claim 1: Trial Court Violated the Confrontation Clause by Admitting Co–Defendant's Statements

For his first ground for relief, Madrigal argues that the admission of two state-

ments by his co-defendant Chris Cathcart violated his constitutional rights under the Confrontation Clause. The statements, which various prosecutors read to the jury, exceed 70 pages of transcript testimony. In the first statement, Cathcart denied knowledge of a planned robbery at the KFC. In the statement, Cathcart said Madrigal asked him to visit a "girl's" house with him. According to Cathcart's statement, he fell asleep in the car and woke up at the KFC. After he woke up, Madrigal jumped in the car and they drove off. In his first statement, Cathcart said that he found out about the robbery the next day on the news.

Cathcart made his second statement four hours after his first statement. With this statement, Cathcart admitted that he knew Madrigal intended to rob the KFC. In the second statement, Cathcart acknowledged having agreed to ride along with Madrigal. According to Cathcart, Madrigal went into the KFC alone and returned three to five minutes later. Cathcart claimed in this statement that Madrigal did not tell Cathcart about the shooting. Madrigal and Cathcart returned to Madrigal's house and counted the money.

At trial, Cathcart refused to testify, invoking his Fifth Amendment rights. The trial court, over defense counsel's objections, allowed the prosecuting attorneys to read both of Cathcart's entire statements into the record. In reading the statements into the record, one prosecuting attorney "played" the role of the police officer while another person assumed Cathcart's role. The admission of the statements constituted 79 pages of the trial record.

The Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. That guarantee includes the right to cross examine witnesses. *Pointer v. Texas,* 380 U.S. 400, 404, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Statements by a non-testifying accomplice "that implicate a defendant are presumptively unreliable and their admission violates the Confrontation Clause." *Bulls,* 274 F.3d at 334 (citing *Douglas v. Alabama,* 380 U.S. 415, 419, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965)); *see also Bruton v. United States,* 391 U.S. 123, 126, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Hill v. Hofbauer,* 337 F.3d 706 (2003) (holding that such statements do not constitute statements against penal interest and noting that *Douglas, Bruton,* and *Lee* "evidence that the Supreme Court had clearly established the principle that a co-defendant's custodial confessions are unreliable and not within a 'firmly rooted' hearsay exception prior to *Lilly*"). To overcome the presumption of unreliability attached to non-testifying accomplice confessions, the prosecution must show that the proffered statements bear "adequate indicia of reliability." *Ohio v. Roberts,* 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).

The Ohio Supreme Court found that Cathcart's statements did not meet the *Ohio v. Roberts* standard, and thus, their admission violated Madrigal's constitutional right to confront witnesses against him. The state supreme court concluded that Cathcart's first statement did not fit into the hearsay exception for statements against interest, stating, "Cathcart's attempts to portray himself as an innocent bystander do not qualify as a statement against interest and should have been excluded." App. to Return of Writ, Vol. IV (Ohio Supreme Ct. Direct B), Ex. 11 at 118. As for the second statement, the Ohio Supreme Court noted that "while also tending to minimize his own involvement, [it] could qualify as an exception to the hearsay rule." App. to Return of Writ, Vol. IV (Ohio Supreme Ct. Direct B), Ex. 11 at 118. The court then held that, even

if the second statement were admissible under the hearsay rule, the admission of both statements violated Madrigal's constitutional rights under the Confrontation Clause. App. to Return of Writ, Vol. IV (Ohio Supreme Ct. Direct B), Ex. 11 at 118. Although it found that the use of co-defendant Cathcart's statement violated Madrigal's rights, the Ohio Supreme Court further held that the violation was harmless error, reasoning that the "strength of the state's case was found in the testimony of eyewitnesses."

In this habeas review, this Court determines if the Ohio Supreme Court's Confrontation Clause and harmless error findings are contrary to, or an unreasonable application of *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *Lilly v. Virginia*, 527 U.S. 116, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999); *Brecht v. Abrahamson*, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) and *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

█ Co-defendant's custodial confessions are unreliable and do not fall within the statement against penal interest hearsay exception. *Bruton v. United States*, 391 U.S. 123, 126, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968); *Douglas v. Alabama*, 380 U.S. 415, 419, 85 S.Ct. 1074, 13 L.Ed.2d 934 (1965). This unreliability extends to self-inculpatory co-defendant custodial statements. *Hill*, 337 F.3d at 715 (finding that clearly established Supreme Court precedent establishes that confessions made a co-defendant inculpating not only himself but his co-criminals are "inherently unreliable" and not within a "firmly rooted" hearsay exception for statements against penal interest).

█ Here, Cathcart's statements are not self-inculpating. Instead, Cathcart's statements incriminate only Madrigal as the robber and shooter. Therefore, the Court concludes that the Ohio Supreme

Court's finding that the admission of Cathcart's statements violated the Confrontation Clause is not contrary to or an unreasonable application of clearly established federal law.

Having found that the trial court's admission of co-defendant Cathcart's statements violated Madrigal's constitutional rights, the Court decides whether the error was harmless.

█ The U.S. Supreme Court describes the harmless error doctrine as follows:

> [I]f one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. *The inquiry cannot be merely whether there was enough to support the result, apart from the phase effected by the error. It is rather, even so, whether the error itself had substantial influence.* If so, or if one is left in grave doubt, the conviction cannot stand.

*Kotteakos v. United States*, 328 U.S. 750 at 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (emphasis added). Under the harmless error doctrine, courts deem an error harmless unless it "had a substantial and injurious effect or influence in determining the jury's verdict." *Brecht*, 507 U.S. at 637, 113 S.Ct. 1710 (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)); *see also Gilliam v. Mitchell*, 179 F.3d 990, 994–95 (6th Cir. 1999) (endorsing the *Brecht* harmless error standard in confrontation clause cases). This standard of review requires a reviewing court to examine the effect of the error on the jury rather than the sufficiency of the evidence at trial. *Chapman*, 386 U.S. at 23, 87 S.Ct. 824. If, however, "the matter is so evenly balanced" that this

Court has "grave doubt" as to the harmlessness of the error, it "should treat the error, not as if it were harmless, but as if it affected the verdict (i.e., as if it had a 'substantial and injurious effect or influence in determining the jury's verdict')." *O'Neal v. McAninch,* 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). This effectively places the burden of persuasion on the prosecution to show that the error was harmless.

■ To determine whether the trial court's error was harmless, the Court examines a number of factors the U.S. Supreme Court set forth in *Delaware v. Van Arsdall,* 475 U.S. 673 at 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986). These factors include: (1) "the importance of the witness's testimony in the prosecution's case;" (2) "whether the testimony is cumulative;" (3) "the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points;" (4) "the extent of cross-examination otherwise permitted;" and (5) "the overall strength of the prosecution's case." *Id.* Finally, the judgment shall stand only if a federal habeas court can say with certainty that a trial error had little or no impact on the judgment. *Barker v. Yukins,* 199 F.3d 867, 874 (6th Cir.1999); *cert. den. sub. nom. Yukins v. Barker,* 530 U.S. 1229, 120 S.Ct. 2658, 147 L.Ed.2d 273 (2000).

Here, the Ohio Supreme Court asked "whether there was enough to support the result, apart from the phase affected by the error," as the *Kotteakos* court said it should not. The Ohio Supreme Court found the admission of the out-of-court statements harmless even as it recognized that "Madrigal's defense attempted to place the blame for the crime on Cathcart, which would have made the need for cross-examination even more crucial to the case." *State v. Madrigal,* 87 Ohio St.3d 378, 387, 721 N.E.2d 52, 63 (2000).

In finding that the admission of Cathcart's out-of-court statements was harmless error, the Ohio Supreme Court said that "[t]he strength of the state's case was found in the testimony of the eyewitnesses. ... The testimony of these witnesses was credible and compelling, compared to Cathcart's statements, which were self-serving and lacking in credibility. Therefore, the admission of Cathcart's statements, while error, was harmless beyond a reasonable doubt." App. to Return of Writ, Vol. IV, (Ohio Supreme Ct. Direct B), Ex. 11 at 125. With this description, the Ohio Supreme Court obviously confused the issue. The state used Cathcart's untested statement to buttress other witnesses' testimony. It did not ask the jury to disregard Cathcart's statement as "self-serving and lacking in credibility."

■ For the reasons discussed below, the Court cannot say with any degree of certainty that the trial court's error in admitting Cathcart's statements did not have "substantial influence" on the verdict. At the very least, one is left "in grave doubt" over whether the statements substantially influenced the jury.

The Court now examines the *Van Ardsall* factors.

### 1. Importance of Cathcart's Testimony to Prosecution's Case

The first harmless error factor requires the Court to examine the importance of Cathcart's testimony to the prosecution's case. For the reasons that follow, the Court concludes that Cathcart's statements were important to the prosecution's case.

First, in any case, statements or confessions that "expressly implicate" a defendant are "powerfully incriminating." *Richardson v. Marsh,* 481 U.S. 200, 208, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). Here, Cathcart's statements expressly im-

plicated Madrigal. In describing the KFC robbery, Cathcart told the police:

> So we drove off, and he [Madrigal] just kept saying, *Oh man, man.* And I'm like, What, what happened? He didn't tell me nothing. We got back to his house, or his girl's house on Alldays.

Tr. Vol. IX (Trial) at 2024 (emphasis added). Later, the following exchange occurs between Cathcart and police officer Leiter:

> Officer Leiter: That wakes you up that he jumps in, and *he's saying, Oh man, oh man, kind of like what? What would you describe it like? Like I just messed up big time?*
>
> Mr. Cathcart: Yeah.
>
> Officer Leiter: Huh?
>
> Mr. Cathcart: Uh-huh. Yeah.
>
> Officer Leiter: Would that be an accurate description of him acting and saying, Oh man, oh, man.
>
> Mr. Cathcart: Yes.
>
> Officer Leiter: Huh?
>
> Mr. Cathcart: He said that about three times, Oh man, he drove, he's driving.

Tr. Vol. IX (Trial) at 2039 (emphasis added).

Additionally, in the following exchange with Officer Leiter, Cathcart describes Madrigal's hurried exit from the KFC:

> Officer Leiter: Let's stop for a minute. He's driving. When we [sic] drives out of there, does he drive out of there like he's pulling out of his driveway going to church, or is he—
>
> Mr. Cathcart: He's pretty fast.
>
> Officer Leiter: He's hitting it?
>
> Mr. Cathcart: Yes.
>
> Officer Leiter: So he's driving out pretty fast?
>
> Mr. Cathcart: Yes.
>
> Officer Leiter: And he's saying this what? Oh, man, oh man?

> Mr. Cathcart: Yes.

Tr. Vol. IX (Trial) at 2024.

Cathcart also inculpates Madrigal as the robber:

> Mr. Cathcart: He tells me he's about to go rob KFC, Kentucky Fried Chicken.
>
> Officer Leiter: Jamie told you that he was about to go rob it, about to go rob it?
>
> Mr. Cathcart: Yes. He asked me did I want to go with him, just ride with him. I agreed.

Tr. Vol. IX (Trial) at 2071.

Finally, Cathcart directly identifies Madrigal as the shooter:

> Officer Leiter: You knew which one [KFC] you were at, and he jumps in and take [sic] off at a high rate of speed.
>
> Mr. Cathcart: Yes.
>
> Officer Leiter: And he's doing, Oh man, oh man.
>
> Mr. Cathcart: Yes.
>
> Officer Leiter: Didn't you think at that time what might have happened?
>
> Mr. Cathcart: Not really. You know what I'm saying? *I don't know what [sic] he was going to go in there and rob the place and kill somebody.*

Tr. Vol. IX (Trial) at 2057 (emphasis added).

As to the importance of Cathcart's out-of-court statement, the prosecution did not have any physical or forensic evidence that tied Madrigal to the killing. Law enforcement officials did not identify Madrigal's fingerprints in the KFC. Nor did they find blood evidence from Misty Fisher on any of Madrigal's clothing or shoes. Authorities did not find blood in Madrigal's car. They also did not identify any glass particles from the shattered KFC window on

any of Madrigal's belongings. Ballistics evidence did not conclusively link the gun found in Madrigal's bag to the gun used in the crime. Finally, no one found a KFC brown paper sack with money. Instead of forensic or physical evidence, the bulk of the prosecution's case consisted of eyewitness testimony and Cathcart's statements. However, as discussed below, the eyewitness' testimony contained discrepancies about the suspect's description and left open doubt as to the identity of the shooter. Therefore, as a confession by a co-defendant that directly implicated Madrigal, Cathcart's statements played an important part in the prosecution's case.

Although Respondent Bagley argues that Cathcart's statements were not important to the prosecution's case, the prosecutor emphasized Cathcart's statements during trial. First, the prosecutor spent great time presenting Cathcart's statements to the jury. Cathcart's statements comprised seventy-nine pages of the trial record.

Second, the importance that the prosecutor placed upon the out-of-court statements is demonstrated by the prosecutor's extensive use of the statements in final argument. Specifically, she argued, "I would suggest to you [the jury] there's a lot of information that came out of Mr. Cathcart's statement that is consistent and corroborative of all the other testimony from all the other witnesses." Tr. Vol. XI (Trial) at 2565.

The prosecutor then proceeded to identify twenty things from Cathcart's statement, ranging from the date of the robbery to the car used in the robbery, that she argued corroborated the other witnesses' testimony. Tr. Vol. XI (Trial) at 2565–2570. Importantly, the prosecutor stated, "He [Cathcart] describes the clothes that the defendant was wearing, the hooded sweatshirt, dark, and the brown Dickies, and he refers to them as Dickies, not pants, not jeans. Dickies. And there they are [in evidence]." Tr. Vol. XI (Trial) at 2568. She also emphasized the following portion of Cathcart's statement, "The defendant has the brown bag with the money in his hands when he comes out the back door. Todd told you that. Jeff told you that. You heard that also from the co-defendant, Mr. Cathcart." Tr. Vol. XI (Trial) at 2570–2571. Again, in describing the robbery, the prosecutor summarizes, "Defendant gets into the car. And he gets in the driver's side. Again, based on the facts, based on what the witnesses told you, absolutely positively consistent with what the co-defendant said." Tr. Vol. XI (Trial) at 2571. The prosecutor concluded her argument by highlighting Cathcart's statements:

> I just went through 20 things that Mr. Cathcart said to the police that were absolutely consistent with what the witnesses said, what the witnesses knew, things that Mr. Cathcart could not possibly have known had he not been there, and that only, ladies and gentlemen, only the person in the car could have known.

Tr. Vol. XI (Trial) at 2571–72.

Also, the Sixth Circuit has held that a prosecutor's comments about a defendant's post-arrest silence was not harmless error partly because of the prosecutor's repeated references to the defendant's silence. *Gravley v. Mills*, 87 F.3d 779 (6th Cir. 1996). The *Gravley* court found significant the fact that "credibility was such an important issue in the case." *Id.* at 790. Similarly, here credibility was an important issue in the case. Therefore, the prosecution's emphasis on Cathcart's statements weighs in favor of a finding of harmful error.

Final support for the fact that the prosecution's case is not overwhelming is the amount of time that the jury spent deliber-

ating before returning a verdict during the guilt phase. On October 21, the jury began deliberating. The jury considered the evidence for the remainder of the afternoon and overnight. On October 22, the jury returned for a second day of deliberations. After deliberating all day and into early evening, the jury reached its verdict at 7:02 p.m. on the 22nd. The day and a half of deliberations suggest that the jury found the prosecution's evidence of guilt was not overwhelming.

> 2. Whether the Testimony is Cumulative and the Presence of Corroborating or Contradictory Evidence

The second and third elements of the harmless error analysis direct courts to consider whether the improperly admitted evidence is cumulative and whether properly admitted evidence corroborated or contradicted the witnesses' testimony on material points. Because these two prongs are related, the Court examines them together.

Cathcart's statements were not simply cumulative because other evidence contradicted his testimony that Madrigal was the main perpetrator. First, the eyewitnesses' identification testimony contained many discrepancies that cast doubt on Madrigal's identity as the killer.

The state presented identification testimony from five eyewitnesses. Although all five witnesses identified Madrigal as the killer in court, none of the five described the suspect as having facial hair.[3] Tr. Vol. VI–VII, (Trial) at 1178, 1200, 1239, 1272, 1322, 1402, 1492–1506. Even KFC closing manager Eric Armstrong, who was briefly face to face with the suspect and less than a foot away from the suspect, gave no statement describing the perpetra-

tor as having facial hair. Tr. Vol. VI (Trial) at 1200. When asked at trial if the suspect had facial hair, Armstrong replied, "No, I'm not sure." Tr. Vol. VI (Trial) at 1178. KFC worker Carrie Tracy also did not describe the robber as having facial hair.[4]

As a KFC employee who was present during the robbery, Carrie Tracy participated in the preparation of the composite sketch. When asked if the composite sketch was a fair representation of the suspect, Tracy stated that she thought the chins of the composite sketch and the chins of the suspect were particularly similar. Tr. Vol. VI (Trial) at 1323–24. The composite sketch chin had no facial hair. Tr. Vol. VI (Trial) at 1324. At the time of the killing, Madrigal had a goatee. Tracy also stated that she thought the lips on the composite were similar to Madrigal's. Tr. Vol. VI (Trial) at 1337. The composite sketch does not contain a moustache. Tr. Vol. VI (Trial) at 1324. Madrigal has a moustache. Further, the composite sketch arguably bore some resemblance to co-defendant Chris Cathcart. Tr. Vol. XI (Trial) at 2533, 2537, 2542. At the time of the killing, Cathcart was clean-shaven. Tr. Vol XI (Trial) at 2532–2533. Despite the sketch's resemblance to Cathcart, the police did not include Cathcart in any of the lineups. Tr. Vol. XI (Trial) at 2536. Nor did the police show Cathcart's photograph to any of the eyewitnesses. Tr. Vol. XI (Trial) at 2536.

Likewise, Corbett participated in the sketch preparation. Tr. Vol. VII (Trial) at 1408–10. Todd Corbett stated that the robber "looked [him] dead in the face" at close range, but Corbett did not notice any facial hair. Tr. Vol. VII (Trial) at 1402–

---

**3.** Brian Conley also testified that he did not describe the suspect as having facial hair. Tr. Vol. VII (Trial) at 1239–40.

**4.** Carrie Tracy stated she could not recall if the suspect was clean-shaven or had a beard. Tr. Vol. VI (Trial) at 1272.

1403. Another eyewitness, Kerekes, only described the shooter as having a "muggishness, not really facial hair, but, you know, you notice that, where it looks like a guy shaves with an electric razor." Tr. Vol. VII (Trial) at 1435. Officer Johnson, who responded to the 911 call at the KFC, also testified that none of the witnesses described the suspect as having a mustache or beard. Tr. Vol. VII (Trial) at 1495. Further, Officer Johnson admitted that "[i]t's information" worthy of noting if a suspect has a moustache or beard. Tr. Vol. VII (Trial) at 1495. Finally, Officer Morford stated that none of the eyewitnesses to the shooting and robbery described the criminal as having facial hair. Tr. Vol. VII (Trial) at 1505. Officer Morford also conceded that "facial hair, beards, and moustaches are distinctive features for description purposes." Tr. Vol. VII (Trial) at 1503.

Madrigal, however, had a mustache and goatee upon his arrest, only six days after the offense. He also had the same facial hair on an Ohio identification card he obtained only months before the robbery. As described, Cathcart was clean-shaven at the time of the murder.

Additionally, discrepancies existed as to the shooter's clothing. The prosecution claimed that the suspect was wearing khaki "Dickie" pants like the ones found in Madrigal's possession upon his arrest. However, witness descriptions of the suspect's pants ranged from baggy blue jeans to "Carhart" overalls. Specifically, Corbett and Kerekes described the suspect as wearing baggy jeans while Conley stated that the robber was wearing "Carhart" overalls. Tr. Vol. VI–VII (Trial) at 1140–43, 1222, 1456, 1492–1506. Further, three of the five eyewitnesses could not identify Madrigal's brown work pants at trial. Finally, all of the witnesses stated that the suspect was wearing a dark hooded sweat-shirt. Although Madrigal had a dark sweatshirt in his possession when the police arrested him, Cathcart was also wearing a dark hooded sweatshirt during the night of the KFC robbery. Tr. Vol. XI (Trial) at 2533.

Of the five eyewitnesses presented at trial, only two, Tracy and Corbett, had been able to make an out-of-court identification of Madrigal. A third witness, Kerekes, participated in the police lineup, but could not make a positive identification. Further, in an earlier police lineup conducted three days after the crime, KFC employee Tracy identified another person, James Jordan, as the robber.[5] Jordan bears little resemblance to Madrigal. Pet.'s Ex. H.

Finally, the eyewitnesses' identification testimony varied as to the size and build of the robber. KFC employee Carrie Tracy testified that the robber was "tall and stocky." Tr. Vol. VI (Trial) at 1319. Conley and Armstrong described the suspect as having a medium build. Tr. Vol. VI (Trial) at 1177, 1221, 1239. Madrigal is thin. Cathcart fits the size description of the KFC suspect better than Madrigal. Tr. Vol. XI (Trial) at 2533.

Eyewitness identification testimony is recognized as often being less than reliable. The Sixth Circuit noted that, "the jurisprudence and legal scholarship have well established that while eyewitness testimony has a profound impact on juries, it is often times extremely unreliable." *Moss v. Hofbauer*, 286 F.3d 851, 874 (6th Cir.2002) (J. Clay dissenting and citing *Watkins v. Sowders*, 449 U.S. 341, 101 S.Ct. 654, 66 L.Ed.2d 549 (1981)). As in this case, eyewitnesses are often under extremely traumatizing circumstances when they observe the offender.

---

**5.** Madrigal was not present in this lineup.

Additionally, in *Stapleton v. Wolfe*, 288 F.3d 863 (6th Cir.2002), the Sixth Circuit found a similar error to be harmful. In *Stapleton*, the trial court admitted into evidence two taped statements made to the police by one of the defendant's accomplices, Studer. Like Cathcart, Studer first gave a statement to the police denying involvement in the crime. He then subsequently provided a statement acknowledging his involvement and incriminating Stapleton. *Stapleton*, 288 F.3d at 865. As in Madrigal's case, Stapleton's attorneys had no opportunity to cross-examine Studer. *Id.* at 866. The state court found that although the trial court erred by admitting the statements, the error was harmless because the statements were cumulative. *Id.*

Analyzing Supreme Court precedent, the Sixth Circuit Court of Appeals held that the admission of the statements was a Sixth Amendment violation and not harmless error. *Id.* First, the *Stapleton* court noted that even with the third accomplice's testimony, Studer's statements were still "of obvious importance to the prosecution's case." *Id.* It then concluded that although the testimony of a third accomplice, Foreman, corroborated portions of Studer's taped statements, Studer's statements were not cumulative. *Id.* In reaching this conclusion, the *Studer* court reasoned that "Stapleton's jury could have believed that the [sic] Foreman's statements and Studer's taped statements 'reinforced and corroborated each other.'" *Id.* (quoting *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991)).

Similarly, this Court finds that Cathcart's statements were not cumulative. Given the discrepancies in the eyewitness testimony, the failure of any eyewitness to describe the suspect as having facial hair, the lack of forensic evidence linking Madrigal to the crime, and the prosecution's emphasis on the importance of Cathcart's testimony, Madrigal's jury could have believed that Cathcart's statements reinforced the eyewitness testimony. In fact, one juror, Rodriguez, said in her post-trial declaration that she "believed that the statements reinforced some of the important testimony of the eyewitnesses and helped to establish that Jamie Madrigal was indeed at the scene of the crime." Rodriguez Decl., Ex. C.

Final support for the Court's finding that the admission of Cathcart's statements had a substantial and injurious effect on the jury's verdict comes from the Sixth Circuit's recent decision in *Hill v. Hofbauer*. In *Hill*, the trial court admitted into evidence a statement made to police officers by Hill's non-testifying co-defendant, Bulls. *Hill v. Hofbauer*, 337 F.3d 706, 710 (2003). With the statement, the co-defendant, Bulls, confessed to his own role in the robbery and murder while also inculpating Hill and another co-defendant, Matthews. *Id.* at 710–11. After his arrest, Hill made his own statement to the police in which he claimed that although he agreed to the robbery, he did not know that co-defendant Matthews had a gun. *Id.* at 710, 718. During the trial, neither Hill nor Bulls testified. *Id.* at 710. However, the trial court admitted both Hill's and Bulls' statements into evidence. *Id.*

After finding that the admission of Bulls' statements violated Hill's rights under the Confrontation Clause, the Sixth Circuit also concluded that the error was not harmless. *Id.* at 719. In reaching this conclusion, the *Hill* court rejected the state's argument that the error was harmless because Bulls' statement mirrored Hill's own statement about his role in the robbery and subsequent murder. *Id.* at 718. The Sixth Circuit reasoned that although Hill's statement was consistent with Bulls' in several respects, the statements were not identical. *Id.* at 718. Im-

portantly, Bulls' statement implied that Hill knew Matthew had a gun while Hill unequivocally stated that he did not know Matthews had a gun. *Id.* at 718. Hill's knowledge that Matthews had a gun was relevant to proving that Hill had the requisite intent for second-degree murder. *Id.* at 719. In finding the error to be harmful, the *Hill* court concluded:

> Hill's statement presents little question that he originally possessed the requisite intent to rob Johnson, but leaves open whether he knew Matthews had a gun, and therefore whether Hill possessed the requisite malice necessary for second-degree murder. Bulls' statement removes any doubt by implying that Hill knew of the existence of the gun and acquiesced to its role in the robbery. Accordingly, Bulls' statement is more damaging to Hill than his own. We find, therefore, that the Sixth Amendment error had 'a substantial and injurious effect or influence in determining the jury's verdict.'

*Id.* at 719.

Likewise, Cathcart's statements remove any doubt created by the discrepancies in the eyewitnesses' testimony as to whether Madrigal was the shooter. Therefore, the admission of Cathcart's statements had a substantial and injurious effect in determining the jury's verdict.

### 3. The Extent of Cross–Examination Otherwise Permitted

The next prong that the Court considers is the extent of cross-examination permitted. Here, Madrigal's defense counsel had no opportunity to cross-examine Cathcart, in court or during his statements to the police.

In *Brumley v. Wingard,* 269 F.3d 629 (6th Cir.2001),the Sixth Circuit deemed a confrontation clause violation not harmless, even though, during the videotaped deposition in question, defense counsel had been able to cross-examine the witness. *Brumley v. Wingard,* 269 F.3d 629. The *Brumley* court reasoned that the substance of the challenged testimony was not already before the jury from other sources because the challenged testimony constituted the key piece of evidence linking the defendant to the crime. *Id.* at 646. The violation of Madrigal's rights under the confrontation clause was more egregious than the violation of Brumley's rights because unlike Brumley, Madrigal could not cross-examine the witness. In addition, Cathcart's statements include extremely leading questions, further undercutting their reliability.

Therefore, this factor weighs against a finding of harmless error.

### 4. Overall Strength of the Prosecution's Case

The final element of the harmless error analysis directs courts to determine the overall strength of the prosecution's case. Here, without Cathcart's statements, the prosecution's case was not overwhelming. Without Cathcart's statements identifying Madrigal as the main perpetrator, the jury would have had to consider the discrepancies in the eyewitnesses' testimony about the shooter's build and lack of facial hair without any counter evidence pointing to Madrigal as the shooter. This Court believes that Cathcart's statements gave the jurors added assurance that the discrepancies could be explained away.

### 5. Actual Evidence of Prejudice and Effect on Jury Verdict

Finally, Madrigal offers the post-trial declaration of juror Vivian Rodriguez as evidence of actual prejudice. In a post-trial declaration, juror Rodriguez admitted that Cathcart's statements were an important piece of evidence in the prosecution's case:

Regarding the guilt-innocence phase of Jamie Madrigal's trial, I found the statements of the accomplice [Chris Cathcart] which were read to the jury to be an important piece of the evidence presented by the State. While the accomplice's statements alone would not have convinced me of defendant's guilt, the statements had persuasive value. I believed that the statements reinforced some of the important testimony of the eyewitnesses and helped to establish that Jamie Madrigal was indeed at the scene of the crime.

Rodriquez Decl., Ex. C.

For the reasons discussed above, the Court finds that the Confrontation Clause violation was not harmless error and grants Madrigal's first claim.

### B. Claim 2: Failure to Include Lesser Included Offense Instruction

Having found that Madrigal procedurally defaulted this claim, the Court does not reach the merits of this claim.

### C. Claim 3: Trial Court Erred by Improperly Dismissing a Juror

 Claim 3 alleges that the trial court denied Madrigal his right to a fair and impartial jury when it dismissed a potential juror with a felony conviction without questioning the juror to determine if the prospective juror had received a pardon. Two days after potential juror Alvin Michael ("Michael") participated in a preliminary *in camera voir dire*, Assistant Prosecutor Dean Mandross informed the court that Michael had a felony conviction. Furthermore, Mandross had prosecuted the case that resulted in prospective juror Michael's conviction, and one of the detectives that would be testifying at Madrigal's trial had arrested Michael. Mandross noted "So that would be a challenge for cause." Tr. Vol. V, (Trial) at 814. The following discussion then took place:

MR. KLUCAS: Yes. Although I realize a felony conviction certainly raises a presumption of disqualification, I also know that there are those who have been convicted of felonies who have their civil rights restored. I don't know that Mr. Michael's civil rights have been restored. If his civil rights have been restored, I don't believe he is disqualified.

THE COURT: My concern would be that the prosecutor on this case was the prosecutor on the case which convicted him.

MR. KLUCAS: Understood.

MS. BATES: As well as the detective.

MR. KLUCAS: Understood. And if that's the concern, I'd like to ask him and—

MR. MANDROSS: Well that's really the concern. The concern is that you cannot have your jury rights restored. Under the statute you have your right to vote restored, but you're never eligible to be a juror if you're a convicted felon.

Tr., Vol. V, (Trial) at 815–816.

Mandross's statement of the law was incorrect. Under Ohio Rev.Code Ann. § 2961.01, a pardoned felon can serve on a jury. Before the trial court excused him, no one questioned Michael about whether he received a pardon. Madrigal argues that since Michael might have had his right to serve on a jury restored, the Court should have permitted his counsel to question Michael about whether he had any bias toward Mandross or the detective who was to serve as a witness. Further, Madrigal contends that the court erred in dismissing Michael without the state having ever made a formal challenge for cause. Respondent Bagley answers that the trial court's focus was not on Michael's eligibility to serve on a jury but on Michael's prior experience with the prosecutor and the police officer. For this reason,

Bagley contends that the issue of whether Michael was eligible to serve was irrelevant, and therefore, Madrigal suffered no harm from Michael's dismissal.

The Ohio Supreme Court addressed this issue on direct appeal, holding that the trial court had not abused its discretion when it dismissed Michael for cause. The court acknowledged that "[t]he better practice in this case would have been to question the juror, on the record, to determine the status of his previous conviction." App. to Return of Writ, Vol IV. (Ohio Supreme Ct. Direct B), Ex. 11 at 134. The court, however, concluded that "the fact that the same prosecutor and police officer were involved in the case would have been enough to remove the juror for cause." *Id.* Accordingly, the Ohio Supreme Court denied this claim.

The Court determines whether the Ohio Supreme Court's decision is contrary to or an unreasonable application of *Morgan v. Illinois*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992).

The Sixth and Fourteenth Amendment to the Constitution guarantee a criminal defendant the right to an impartial jury. *See Morgan*, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492. In *Morgan*, the Court held that "part of the defendant's guarantee to an impartial jury is an adequate *voir dire* to identify unqualified jurors." 504 U.S. at 729, 112 S.Ct. 2222. "Where an adversary wishes to exclude a potential juror because of bias, then, it is the adversary seeking exclusion who must demonstrate, *through questioning*, that the potential juror lacks impartiality. It is then the trial judge's duty to determine whether the challenge is proper." *Wainwright v. Witt*, 469 U.S. 412, 423, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985).

The trial court did not follow this procedure with respect to Michael's eligibility to serve on a jury. But even if it had followed the procedure precisely, the outcome would not change. The trial court's focus was on Michael's experience with the prosecutor and testifying officer during Michael's prior felony case.[6] Therefore, even if Michael had received a pardon, restoring his right to sit on a jury, the court would still have excused him for cause based on his previous involvement with the prosecutor and the detective.

Further, the trial court's failure to question Michael about his bias toward the prosecutor and police officer is not an abuse of its discretion. "[T]he competency of a juror is for determination by the trial court, which is vested with discretion in determining competency, and . . . his judgment will not be reversed except for abuse of discretion." *Cox v. General Elec. Co.*, 302 F.2d 389, 391 (6th Cir.1962). *See also Wainwright*, 469 U.S. at 428, 105 S.Ct. 844 ("[A] finding [of juror bias] is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province."). As the *Reynolds v. United States*, 98 U.S. 145, 156–57, 25 L.Ed. 244 (1878) court explained:

> [T]he manner of the juror while testifying is oftentimes more indicative of the real character of his opinion than his words. That is seen below, but cannot always be spread upon the record. Care should, therefore, be taken in the reviewing court not to reverse the ruling below upon such a question of fact, except in a clear case.

*Id.*

Here, the fact that the same prosecutor and police officer were involved in both Madrigal's case and Michael's prior crimi-

---

6. Specifically, the trial court stated: "My concern would be that the prosecutor on this case was the prosecutor on the case which convict- ed him. . . . As well as the detective." Tr. Vol. V (Trial), at 815–16.

nal case is enough for a trial judge to remove the juror for cause. *See United States v. Redmond*, 546 F.2d 1386, 1389 (10th Cir.1977) (upholding excusal of jurors who were acquainted with any attorneys in the case), *cert. denied*, 435 U.S. 995, 98 S.Ct. 1645, 56 L.Ed.2d 83 (1978). Further, the trial court has the discretion to excuse a juror when it "is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." *Witt*, 469 U.S. at 426, 105 S.Ct. 844. "[Reviewing courts] give considerable deference to the court's decision to excuse a juror on this basis, because such decisions are based in large part on its face-to-face credibility assessment of the prospective jurors." *See id.* at 426–29, 105 S.Ct. 844 (discussing universal reasons for deference). Although the trial court did not question Michael about his prior conviction or his experience with the prosecutor, it did question Michael face to face. Therefore, the trial court had the best opportunity to make a credibility determination.

Finally, Madrigal does not dispute that the prosecutor and police officer worked on both cases. Therefore, although the trial court did not strictly follow the proper voir dire procedure, it did not abuse its discretion in dismissing Michael for cause. Consequently, the Court denies Madrigal's third claim.

### D. Claim 4: Trial Court Improperly Instructed the Jury

With his fourth claim, Madrigal asserts that the trial court violated his Eighth and Fourteenth Amendment constitutional rights by failing to expressly tell the jury that a single juror could prevent the imposition of the death penalty. According to Madrigal, the trial court's sentencing instruction improperly instructed the jury that a life sentence had to be by unanimous vote.

At trial, Madrigal's attorney asked the court to give the jury a *Brooks* instruction. Specifically, Madrigal's attorney asked the trial court to instruct the jury as follows:

> It is not necessary that you, as a jury, unanimously reject death as the appropriate sentence before considering a life sentence. There is no presumption that death is the appropriate sentence. If any one of you find that the aggravating circumstance does not outweigh the mitigating factors beyond a reasonable doubt, then you must deliberate the appropriate life sentence.

App. to Return of Writ, Vol. IV, (Ohio Supreme Ct. Direct B), Ex. 11.at 135–138. In *State v. Brooks*, 75 Ohio St.3d 148, 661 N.E.2d 1030 (1996), the Ohio Supreme Court held that:

> In Ohio a solitary juror may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors. Jurors from this point on should be so instructed.

*Id.* at 162, 661 N.E.2d 1030.

Instead of giving the jury the *Brooks* instruction verbatim, the trial court told the jury:

> You shall recommend the sentence of death if all 12 jurors find beyond proof—by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors. If you do not unanimously find that the aggravating circumstances outweigh the mitigating factors, you shall unanimously recommend either a life sentence with parole eligibility after 20 years of imprisonment or a life sentence with parole eligibility after serving 30 years of imprisonment.

Tr. Vol. XIII (Mitigation & Sentencing) at 247–248.

On direct appeal, the Ohio Supreme Court rejected Madrigal's claim and upheld the sentencing instruction. The Ohio Supreme Court reasoned that although the trial court's instruction did not include the *Brooks* instruction verbatim, the instruction was consistent with Ohio Rev.Code Ann. § 2929.03(D)(2). In contrast, the Ohio Supreme Court noted that the error in *Brooks* involved a misstatement of Ohio law. Namely, in *Brooks,* the court told the jury that they had to unanimously find that death was inappropriate before they could consider a life sentence. The Ohio Supreme Court stated that, unlike in *Brooks,* in Madrigal's case, the trial court did not tell the jury that it could not consider a life sentence until it decided that a death sentence was inappropriate. Therefore, the Ohio Supreme Court concluded that the trial court did not commit the *Brooks* error because, although the trial court did not give the exact *Brooks* instruction, it gave the substance of the *Brooks* instruction. Specifically, the instructions as a whole adequately apprized the jurors that a single juror could prevent a death sentence by finding that the aggravating circumstances did not outweigh the mitigating factors.

The Court decides whether the Ohio Supreme Court's decision is contrary to or an unreasonable application of *Estelle v. McGuire,* 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

In deciding whether an erroneous jury instruction deprived a defendant of his constitutional rights, the standard is " 'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.' " *Estelle,* 502 U.S. at 72–73, 112 S.Ct. 475 (quoting *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)). The *Estelle* court further concluded that "in reviewing an ambiguous instruction ... [courts] inquire 'whether there is a reason-able likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Id.* (citation omitted). But the "fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief." *Id.* at 71–72, 112 S.Ct. 475. Further, the jury must view the instruction "in the context of the instructions as a whole and the trial record." *Id.* at 72, 112 S.Ct. 475 (citing *Cupp,* 414 U.S. at 147, 94 S.Ct. 396). Finally, the Supreme Court "ha[s] defined the category of infractions that violated 'fundamental fairness' very narrowly." *Id.* at 73, 112 S.Ct. 475, quoting (*Dowling v. United States,* 493 U.S. 342, 352, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990)).

Madrigal objects to the trial court's failure to give the *Brooks* instruction verbatim. He further alleges that the trial court's instructions improperly led the jury to believe that the decision to opt for a life sentence as opposed to a death sentence was required to be unanimous. According to Madrigal, the instruction should have more clearly indicated that it only takes one juror to prevent a death sentence and instead impose a life sentence. Continuing, Madrigal says that this erroneous instruction created the risk that individual jurors might believe that their single vote could not affect the sentence. Madrigal relies on *Mapes v. Coyle,* 171 F.3d 408 (6th Cir.1999) and *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) as support for his assertion.

Madrigal is incorrect. First, Madrigal's instructions were not incorrect under Ohio law. The Ohio Supreme Court has held that instructions that implicitly tell jurors that a single juror could prevent the death penalty are consistent with Ohio Rev.Code Ann. § 2929.03(D)(2). *See State v. Smith,* 97 Ohio St.3d 367, 372, 780 N.E.2d 221 (2002); *State v. Stallings,* 89 Ohio St.3d 280, 293, 731 N.E.2d 159 (2000).

Additionally, the Constitution does not require an express "hold out" juror instruction that informs a jury of the consequences of its inability to reach a unanimous verdict. *See Coe v. Bell,* 161 F.3d 320 at 339–340 (6th Cir.1998). In *Coe,* the court upheld a sentencing instruction that read:

If you unanimously determine that no statutory aggravating circumstance has been proved by the State beyond a reasonable doubt; or if the Jury unanimously determine that [aggravating circumstances] have been proved by the State beyond a reasonable doubt; but that said [aggravating circumstances] are outweighed by one or more mitigating circumstances, the sentence shall be life imprisonment.

*Id.* at 337. The *Coe* court rejected the argument that the instructions were unconstitutional because they created a reasonable probability that the jurors believed that they could consider only those mitigating circumstances that they unanimously agreed were present. *Id.* at 338. Specifically, the *Coe* court reasoned that the instructions did not require the jury to be unanimous "before it could even *consider* a particular mitigating factor." *Id.*

Although *Coe* dealt with the Tennessee death penalty statute instead of the Ohio capital statute and with unanimity as to mitigating factors, the underlying *Coe* reasoning applies here. Like the permissible *Coe* instructions that did not require the jury to be unanimous before considering a mitigating factor, Madrigal's jury instructions did not require the jury to unanimously reject the death penalty before they could consider a life sentence. Instead, the instructions state that the jury had to be unanimous in *recommending* the death penalty. This is different from a requirement that the jury had to be unanimous in rejecting the death penalty before considering a life sentence.

Madrigal's trial attorney acknowledged this distinction during the trial proceedings. In requesting the *Brooks* instruction, Madrigal's attorney asked that the jury not be told that it had to "unanimously reject" the death penalty. In fact, when asked if Klucas didn't "want them [the jury] told that you have to unanimously find?," Klucas replied, "I don't want them told that they have to unanimously reject." Tr. Vol. XIII (Mitigation & Sentencing) at 20.

Further, the actual instructions stated *"If you do not unanimously find* that the aggravating circumstances outweigh the mitigating factors, you shall unanimously recommend either a life sentence...." Although the instructions do not clearly say so, the phrase "If you do not unanimously find" adequately conveys the fact that the jurors could consider a life sentence if any one of them found that the aggravating circumstances did not outweigh the mitigating factors.

The Sixth Circuit has applied the *Coe v. Bell* reasoning in other cases. In *Scott v. Mitchell,* 209 F.3d 854, 873–77 (6th Cir. 2000), the court noted that jury instructions that require unanimity as to the overall weighing process as opposed to an individual mitigating factor are constitutionally permissible. *Scott,* 209 F.3d at 875–76. In *Byrd v. Collins,* 209 F.3d 486 (6th Cir.2000), the court held that an "instruction that a jury verdict recommending a life sentence must be unanimous was a proper statement of Ohio law." *Byrd,* 209 F.3d at 528.

Madrigal contends that *Scott* and *Byrd* are distinguishable because both cases went to trial before the *Brooks* decision. This argument fails to persuade the Court. As the Sixth Circuit explained, "[t]he only reliance on federal constitutional law in *Brooks* ... is its citation to *Mills* in explaining why it would thenceforth require

that Ohio jurors be explicitly instructed that 'a solitary juror may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors.'" *Scott*, 209 F.3d at 876 (quoting *Brooks*, 75 Ohio St.3d at 162, 661 N.E.2d at 1042). The *Scott* court went on to note that "our *Coe* decision ... explicitly held that unanimity instructions like those in this case do not violate *Mills*." *Id.* at 877.

Here, Madrigal's instructions do not violate *Mills*. In *Mills v. Maryland*, 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), the Supreme Court held that the following instructions were unconstitutional:

> You must conclude whether the aggravating circumstance number two has been proven beyond a reasonable doubt. If you unanimously conclude that it has been so proven, you should answer that question yes. If you are not so satisfied, then of course you must answer no.

*Id.* at 378, 108 S.Ct. 1860. In reaching this conclusion, the *Mills* court reasoned:

> We conclude that there is a substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance. Under our cases, the sentencer must be permitted to consider all mitigating evidence. The possibility that a single juror could block such consideration, and consequently require the jury to impose the death penalty, is one we dare not risk.

*Id.* at 384, 108 S.Ct. 1860.

The problem with this instruction is not a unanimity problem, but, rather, that it does not allow for the possibility of any mitigating factors. The Supreme Court has interpreted *Mills:*

> *Mills* requires that each juror be permitted to consider and give effect to mitigating evidence when deciding the ultimate question whether to vote for a sentence of a death. This requirement means that ... each juror must be allowed to consider all mitigating evidence ... whether aggravating circumstances outweigh mitigating circumstances and whether the aggravating circumstances, when considered with any mitigating circumstances, are sufficiently substantial to justify a sentence of death. Under *Mills*, such consideration of mitigating evidence may not be foreclosed by one or more jurors' failure to find a mitigating circumstance.

*McKoy v. North Carolina*, 494 U.S. 433 at 443, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). The instruction in Madrigal's case does not have the unconstitutional effect of foreclosing consideration of any mitigating factors.

Further, the *Brooks* court only required that the jurors be told that a single juror be told that it could prevent the death penalty. It did not require that the trial court give a verbatim *Brooks* instruction.

Madrigal also misplaces his reliance on *Mapes*. In *Mapes v. Coyle*, 171 F.3d 408, the Sixth Circuit found that instructions which require the jury to unanimously reject the death penalty before considering a life sentence do not comport with Ohio Rev.Code Ann. § 2929.03(D)(2). Specifically, the *Mapes* court held that the following instruction is constitutionally impermissible because it creates a risk of erroneous imposition of the death penalty:

> Now, as I have indicated, if all twelve jurors find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors, that is the aggravating circumstances

which he was found guilty, Specification 4 in each count, then you must return a finding to the Court.

I instruct you, as a matter of law, that if you make such finding then you have no choice and must recommend to the Court that the sentence of death be imposed on the defendant, David Mapes.

. . .

On the other hand, if after considering all of the relevant evidence raised at trial, the testimony, the other evidence, the unsworn statement of David Mapes, the evidence of the State of Ohio, and the arguments of counsel, you find that the State of Ohio failed to prove that the aggravating circumstances which the defendant, David Mapes, was found guilty of committing outweigh the mitigating factors, then you will return your verdict reflecting your decision. *That is, you must unanimously find that the State has failed to prove beyond a reasonable doubt that the aggravating circumstances of which the defendant was found guilty of committing outweigh the mitigating factors. In this event you will then proceed to determine which of two possible imprisonment sentences to recommend to the Court.*

*Mapes,* 171 F.3d at 416 (Emphasis added).

In finding this instruction unconstitutional, the *Mapes* court noted that "the Ohio death-sentence statute contains no requirement that a capital jury must unanimously reject a death sentence before considering life imprisonment." *Id.* Therefore, the *Mapes* court reasoned that the instructions were contrary to the Ohio sentencing statute because they "requir[ed] the jury to unanimously reject the death penalty before considering a life sentence." *Id.* In particular, the *Mapes* court found the inclusion of the phrase "you will then proceed" important because it resulted in the jury having to reject the death

sentence before considering life imprisonment. *Id.*

Madrigal argues that the *Mapes* reasoning applies to his case because he says, like the *Mapes* jury, his jury had the same dangerous understanding that a decision to opt for a life sentence as opposed to a death sentence had to be unanimous. He further claims that this misunderstanding led to the risk that individual jurors might believe that their single vote could not affect the ultimate result. However, Madrigal's instructions do not require the jury to unanimously reject the death penalty before *considering* a life sentence. Instead, the instructions require the jury to unanimously *recommend* the death sentence. Additionally, Madrigal's instructions do not contain the phrase "you will then proceed."

Finally, the decision in *Davis v. Mitchell,* 318 F.3d 682 (6th Cir.2003), does not alter the analysis. In *Davis,* the court determined that "any instruction requiring that a jury must first unanimously reject the death penalty before it can consider a life sentence likewise precludes the individual juror from giving effect to the mitigating evidence and runs afoul of *Mills.*" *Davis,* 318 F.3d at 689. The *Davis* court then found the following sentencing instructions to be unconstitutional:

If all twelve members of the jury find by proof beyond a reasonable doubt that the aggravating circumstances which Wiley Davis, Jr. was found guilty of committing outweigh the mitigating factors, if any, then you must return such finding.

. . .

On the other hand, if after considering all of the relevant evidence raised at trial . . . you find that the State of Ohio failed to prove beyond a reasonable doubt that the aggravating circumstances which the defendant, Wiley

Davis, Jr., was found guilty of committing, outweigh the mitigating factors, then you will return your verdict reflecting your decision; that is, you *must* find that the State has failed to prove beyond a reasonable doubt that the aggravating circumstances which the defendant was found guilty of committing outweigh the mitigating factors. *In this event you will then proceed* to determine which of the two possible life imprisonment sentences to recommend to the Court.

*Id.* at 684–685 (Emphasis added).

In reaching this conclusion, the *Davis* court reasoned:

[T]here is a reasonable likelihood that the jury believed that it could not render a verdict in favor of life imprisonment rather than death unless the jury was unanimous with respect to its reasoning on the presence of mitigating factors and unless the jury was unanimous in rejecting the death penalty. Instructions that leave a jury with the impression that juror unanimity was required to mitigate the punishment from death to life imprisonment clearly violate the Eight Amendment.

*Id.* at 685. The *Davis* court ties this problem to the fact that it would be unconstitutional to require unanimity for the finding of a mitigating factor, because that could mean that:

[I]f aggravating factors have been found by the jury, one or more jurors who—in disagreement with other jurors—find no mitigating factor, or find different mitigating factors, or find that the aggravating factors do not outweigh mitigating factors found by some (but not all) of the jurors, or find that no mitigating factor outweighs aggravating factors, could still produce a death verdict or a hung jury, depending on how state law treats the disagreement.

*Id.* at 688. Such a result would be unconstitutional. Under the Eighth Amend-

ment, "the sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'" *Skipper v. South Carolina*, 476 U.S. 1 at 4, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986) (quoting *Eddings v. Oklahoma*, 455 U.S. 104 at 114, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982)).

Madrigal, however, points to a different complaint regarding the instruction given in his case. Madrigal argues that a "holdout juror"—one who is the sole juror opposing the death penalty—might have changed his vote in favor of the death penalty because he or she mistakenly believes that a decision not to impose the death penalty must be unanimous. The Sixth Circuit Court of Appeals has held, however, that there is no constitutional requirement that the court explicitly instruct the jury of what will happen in a holdout juror situation. *See Coe*, 161 F.3d at 339–340.

Another factor in the *Davis* decision was the fact that the instruction in that case:

[C]ombined with the jury verdict form, not only 'could' but by its plain language 'would' lead a reasonable juror to conclude that the only way to get a life verdict is if the jury unanimously finds that the aggravating circumstances do not outweigh the mitigating circumstances, an entirely different instruction from one that clearly informs the jurors that a life verdict can be rendered by a jury that has not first unanimously rejected the death penalty.

*Davis*, 318 F.3d at 689. The difference between the *Davis* instructions and Madrigal's instructions is that the jury "would" have understood the instructions in *Davis* to require unanimity, while the jury in Madrigal's case "could" have understood the instructions to require unanimity. For example, unlike the *Davis* instructions, Madrigal's instructions do not contain the phrases "must find" or "in this event you

will then proceed." Madrigal's instructions also did not expressly tell the jurors that they could not consider a life sentence until they determined that a death sentence was inappropriate.

Finally, although *Davis* is in conflict with *Coe, Roe,* and *Scott,* these three cases remain controlling authority because " '[a] panel of this [the Sixth Circuit] Court cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision.' " *Taylor v. Mitchell,* —— F.Supp.2d ——, 2003 WL 1477010 (N.D.Ohio Mar.3, 2003) (discussing the effect of *Davis* and quoting *United States v. Smith,* 73 F.3d 1414 (6th Cir.1996)).

In sum, it is possible that the jury in Madrigal's case might have understood the challenged instruction to mean that a decision not to impose the death penalty had to be unanimous. But, this possibility is so remote that it does not rise to the level of being a "reasonable likelihood" as required in *Estelle.*

Consequently, the Court denies Madrigal's fourth claim.

### E. Claim 5: Trial Court Improperly Instructed the Jury that Mitigating Factors Must Outweigh the Aggravating Circumstances

Madrigal procedurally defaulted his fifth claim. Even if he had not, the claim fails on the merits.

■ Madrigal's fifth claim asserts that the trial court violated his Eighth and Fourteenth Amendment rights by improperly instructing the jury that to impose a life sentence, the mitigating factors must outweigh the aggravating circumstances. Respondent Bagley admits that the instruction in question was erroneous, but contends that, in light of the many other

correct instructions given by the court, the error was harmless.

The Ohio Supreme Court denied this claim on direct appeal, agreeing with Bagley that the instruction, although erroneous, was harmless.

During preliminary instructions, the trial court instructed the jury:

Very briefly, if the aggravating circumstances outweigh the mitigating factors, your sentence should be death. If the mitigating factors outweigh the aggravating circumstances, then your verdict may be life with parole eligibility, after a term of twenty or thirty full years has been served.

Tr. Vol. XIII (Mitigation & Sentencing) at 47. Later, after the presentation of evidence in the penalty phase, the trial court instructed the jury:

If the mitigating factors outweigh the aggravating circumstances, then your verdict shall be life with parole eligibility after a term of either 20 or 30 full years has been served.

Tr. Vol. XIII (Mitigation & Sentencing) at 247.

After reviewing the trial record, the Ohio Supreme Court determined that the erroneous instruction in Madrigal's case was harmless in the context of numerous other correct instructions. This included at least four correct statements of the law in the jury charge. Notably, at one point, the trial court instructed the jury that "If you do not unanimously find that the aggravating circumstances outweigh the mitigating factors, you shall unanimously recommend ... a life sentence." Tr. Vol. XIII (Mitigation & Sentencing) at 247–248. This instruction resolves any juror confusion as to what their verdict should be if they find that the aggravating and mitigating circumstances are in equipoise. Additionally, the jury verdict forms correctly

stated the weighing procedure. Furthermore, the jury only deliberated for two hours before returning with a sentence, and at no time during their deliberations did they ask any questions about the proper standard.

The Ohio Supreme Court determined that "[w]hen reviewing the jury instructions as a whole, it cannot be said that 'but for the error, the outcome of the trial clearly would have been otherwise.'" App. to Return of Writ, Vol. IV. (Ohio Supreme Ct. Direct B), Ex. 11, at 138–141 (quoting *State v. Underwood*, 3 Ohio St.3d 12, 444 N.E.2d 1332 at syllabus (1983)).

The Court determines whether the Ohio Supreme Court's denial of this claim was contrary to or an unreasonable application of *Estelle v. McGuire*, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). "[T]he fact that the instruction was allegedly incorrect under state law is not a basis for habeas relief." *Id.* at 71–72, 112 S.Ct. 475 (citation omitted). Instead, the question is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Id.* at 72–73, 112 S.Ct. 475 (quoting *Cupp v. Naughten*, 414 U.S. 141 at 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)). Additionally, in reviewing an ambiguous jury instruction, the standard is " 'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Id.* at 72, 112 S.Ct. 475 (quoting *Boyde v. California*, 494 U.S. 370 at 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990)). Finally, the *Estelle v. McGuire* court instructs that "the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Id.* at 72, 112 S.Ct. 475 (quoting *Cupp v. Naughten*, 414 U.S. 141 at 147, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973)).

As the Ohio Supreme Court noted, the single jury instruction at issue was incorrect under Ohio law. However, when viewing that instruction in the context of the instructions as a whole, the error is harmless. A review of the record shows that the trial court properly instructed the jury as to the burden of proof applicable to aggravating circumstances and mitigating factors on numerous occasions. First, the trial court told the jury, "the prosecution has the burden of proving beyond a reasonable doubt that the aggravated—aggravating circumstances outweigh any mitigating factors which may be present." Tr. Vol. XIII (Mitigation & Sentencing) at 246. The trial court further instructed:

> You as jurors must balance the evidence. The existence of mitigating factors does not foreclose the death sentence, if the aggravating circumstances that the offense was committed during an aggravated robbery outweigh the mitigating factors by proof beyond a reasonable doubt. If the aggravating circumstances outweigh the mitigating factors your sentence shall be death.

Tr. Vol. XIII (Mitigation & Sentencing) at 246–47. Again, the trial judge gave the correct weighing instructions when it told the jury, "You shall recommend the sentence of death if all twelve jurors find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating factors." Tr. Vol. XIII (Mitigation & Sentencing) at 247. Finally, the trial court stated, "If you do not unanimously find that the aggravating circumstances outweigh the mitigating factors, you shall unanimously recommend either a life sentence with parole eligibility after serving 20 years of imprisonment or a life sentence with a parole eligibility after serving 30 years of imprisonment." Tr. Vol. XIII (Mitigation & Sentencing) at 247–48.

Madrigal shows no reasonable likelihood that the jury applied the incorrect standard when it selected the death penalty as the appropriate punishment. Given the numerous correct instructions, along with the verdict forms containing the correct instructions, the error was harmless. Additionally, the erroneous instruction in Madrigal's case did not, by itself, so infect the entire trial that the resulting conviction violates due process. *See id.* at 72, 112 S.Ct. 475. Therefore, the Ohio Supreme Court's denial of this claim was not contrary to or an unreasonable application of *Estelle v. McGuire.*

F. Claim 6: Trial Court Decision was Contrary to the Weight of the Evidence Presented at Mitigation

In his sixth claim, Madrigal challenges four aspects of the trial court's independent review of the aggravating and mitigating factors. First, he asserts that the sole aggravating factor, the occurrence of the murder during the course of an aggravated robbery, was insufficient to outweigh the many mitigating factors presented by his attorneys. Second, Madrigal claims that the trial court erred in not giving any weight to favorable evidence regarding Madrigal's prison behavior. Specifically, Madrigal says the trial court should have given more weight to his good conduct while incarcerated, his adjustment to prison life, and his capacity for serving a long life sentence without disciplinary problems. Third, he argues that the trial court erred when it ruled that the circumstances of the crime had no mitigating features. Madrigal contends that the evidence suggests that, while Cathcart and he planned the robbery, the shooting was more likely an unplanned reaction. He says that he panicked when Misty Fisher had trouble opening the safe, and that these circumstances deserved weight in mitigation. Finally, Madrigal alleges that the trial court was incorrect when it determined at sentencing that the evidence did not leave any residual doubt about Madrigal's identity as the shooter and principal offender in the aggravated robbery. Accordingly, Madrigal urges the Court to vacate his death sentence and remand the case to the state court for a new penalty phase.

After reviewing the trial court's decision and conducting its own weighing of the aggravating and mitigating factors, the Ohio Supreme Court denied Madrigal's claim. This Court now decides whether the Ohio Supreme Court's denial of this claim was contrary to or an unreasonable application of *Tuilaepa v. California,* 512 U.S. 967, 978–980, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994) (holding that sentencer has discretion to evaluate and weigh aggravating and mitigating factors in deciding whether to impose death penalty).

▮ With regard to each of these claims, Madrigal argues that the trial court did not give sufficient weight to certain mitigating factors when it weighed mitigating and aggravating factors. However, the relevant inquiry is whether the trial court considered these factors, not whether the trial court gave any particular weight to a factor. *See* Ohio Rev.Code Ann. § 2929.03(D)(3) ("Upon *consideration* of the relevant evidence raised at trial, the testimony, other evidence, statement of the offender, arguments of counsel, and, if applicable, the reports submitted to the court pursuant to division (D)(1) of this section ...") (Emphasis added). So long as the trial court considered each of the appropriate mitigating factors, the trial court has discretion to afford no weight to individual mitigating factors. *See State v. Fox,* 69 Ohio St.3d 183, 193, 631 N.E.2d 124, 132 (1994).

As discussed below, the trial court considered the mitigating factors but permissibly afforded them little or no weight.

*Murder Committed in the Course
of an Aggravated Robbery*

Madrigal first claims that the trial court erred in concluding that the sole aggravating factor, the occurrence of the murder during the commission of an aggravated robbery, outweighed the mitigation evidence.

He is incorrect. First, the trial court properly considered and weighed all of the aggravating and mitigating circumstances. Additionally, as the Ohio Supreme Court noted in affirming the trial court's decision, Madrigal's death sentence is not disproportionate to other death sentences in aggravated robbery cases with similar mitigating and aggravating circumstances. *State v. Madrigal,* 87 Ohio St.3d 378, 399–401, 721 N.E.2d 52 (comparing Madrigal's aggravating and mitigating factors to similar Ohio capital cases). Therefore, the Court concludes that the trial court did not unreasonably determine the facts in light of the evidence presented.

*Good Behavior While in Prison*

Second, Madrigal says that the trial court should have considered and given weight to his good behavior in prison. Courts may consider good behavior in prison as a mitigation factor. *State v. Smith,* 80 Ohio St.3d 89, 121–122, 684 N.E.2d 668, 696 (1997); *State v. Bradley,* 42 Ohio St.3d 136, 149, 538 N.E.2d 373 (1989). Here, the trial court did take into account the mitigating factor of good behavior in prison. However, it determined that the factor added no weight to the cumulative weight of the mitigating factors. It held that "[i]nformation that Madrigal is capable of serving a long life term is not entitled to any weight." Vol II., Ex. 6 at 205. That decision is within the discretion of the trial court judge. *Fox,* 69 Ohio St.3d at 193, 631 N.E.2d 124. Therefore, it was not error for the trial court to afford no weight to this particular mitigating factor.

Even if the trial court had not properly considered the mitigating factor of good behavior in prison, the Ohio Supreme Court corrected that error when it reweighed the mitigating factors. *See Clemons v. Mississippi,* 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990) (holding that appellate court can reweigh factors and impose death penalty itself). In its decision, the Ohio Supreme Court determined that "evidence that [Madrigal] conformed well to prison life ... is entitled to some mitigating weight." Vol. IV., Ex. 11 at 149. Because both the trial court and the Ohio Supreme Court weighed this factor in making their decisions, the Court denies this portion of Madrigal's claim arguing that the state courts did not consider his good behavior in prison.

*Circumstances of the Crime*

Madrigal also claims that the trial court should have taken into account the circumstances of the crime as a mitigating factor. He is correct. In *State v. Stumpf,* 32 Ohio St.3d 95, 512 N.E.2d 598, the Ohio Supreme Court held that:

R.C. 2929.04(B) requires the jury, trial court, or three-judge panel to "consider and weigh against the aggravating circumstances proved beyond a reasonable doubt, the nature and circumstances of the offense" ... In a particular case, the nature and circumstances of the offense may have a mitigating impact, or they may not ... Either way, they must be considered.

*Stumpf,* 32 Ohio St.3d at 99, 512 N.E.2d 598 (citing *State v. Steffen,* 31 Ohio St.3d 111, 117, 509 N.E.2d 383, 390 (1987)). However, Madrigal is incorrect in asserting that the trial court did not " 'consider and weigh' " the circumstances of the crime. The trial court discussed the nature and circumstances of the crime and held that "[t]here does not appear to be anything mitigating in the nature and cir-

cumstances of this offense." Vol II., Ex. 6 at 202. It rejected Madrigal's interpretation of the circumstances: "The point blank shooting of Misty Fisher while Madrigal was committing an aggravated robbery with a firearm reveal circumstances with no mitigating features." App. to Return of Writ, Vol II. (Trial), Ex. 6 at 202. Again, the trial court has discretion to determine that a particular factor is of no mitigating value. All that the court must do is consider and weigh each factor.

Even if the trial court had not properly addressed this mitigating factor, the Ohio Supreme Court considered the circumstances of the crime when it subsequently did its own weighing of the mitigating and aggravating factors. It held that "[t]he nature and circumstances of the crime offer nothing in mitigation for Madrigal." App. to Return of Writ, Vol IV. (Ohio Supreme Ct. Direct B), Ex. 11 at 147. Because both the trial court and the Ohio Supreme Court properly considered the potentially mitigating factor of the nature and circumstances of the crime, the Court denies this portion of Madrigal's sixth claim.

### Consideration of Residual Doubt

Finally, Madrigal says that the court erred because it did not consider residual doubt as a mitigating factor. Alternatively, he says that the trial court erred in not giving any weight to residual doubt.

The trial court rejected residual doubt as a mitigating factor, concluding that "[t]he evidence forthcoming at trial did not create any residual doubt over the identity of Madrigal as the person who shot Misty Fisher and was the principal offender in the aggravated robbery." App. to Return of Writ, Vol. II (Trial), Ex. 6 at 205. In reweighing the aggravating and mitigating factors, the Ohio Supreme Court reached the same conclusion.

Ohio law does not consider residual doubt … as an acceptable mitigation fac-

tor. *Buell v. Mitchell,* 274 F.3d 337, 358–59 (6th Cir.2001) (citation omitted) As the Ohio Supreme Court explained:

> Our system requires that the prosecution prove all elements of a crime beyond a reasonable doubt. Therefore, it is illogical to find that the defendant is guilty beyond a reasonable doubt, yet then doubt the certainty of the guilty verdict by recommending mercy in case a mistake has occurred. Residual doubt casts a shadow over the reliability and credibility of our legal system in that it allows the jury to second-guess its verdict of guilt in the separate penalty phase of a murder trial.... Residual doubt is not an acceptable mitigating factor under R.C. 2929.04(B), since it is irrelevant to the issue of whether the defendant should be sentenced to death.

*State v. McGuire,* 80 Ohio St.3d 390, 686 N.E.2d 1112, 1123 (1997).

Therefore, the trial court did not unreasonably apply clearly established federal law, or unreasonably determine the facts in light of the evidence presented in the State court proceeding. Accordingly, the Court denies this portion of Madrigal's Claim 6.

In sum, the trial court did consider the mitigating factors cited by Madrigal in Claim 6. It gave those factors different weight than Madrigal believes it should have, but the trial court has discretion to determine how much weight to give each factor. Furthermore, the Ohio Supreme Court's consideration of these facts on direct appeal corrected any error by the trial court. Specifically, the Ohio Supreme Court considered each of the factors and concluded that the single aggravating circumstance, murder during the course of an aggravated robbery, outweighed the mitigation factors. Because the state courts properly considered each of these factors, the Court denies Madrigal's sixth claim.

## INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS

Madrigal makes five ineffective assistance of counsel claims (Claims 7–11). The state courts denied all five claims. The two part *Strickland* analysis governs Sixth Amendment claims of ineffective assistance of counsel. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. Under this standard, to succeed on an ineffective assistance of counsel claim, a petitioner must show:

> First, ... that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

Accordingly, the Court examines each claim to determine if the state courts' decisions were contrary to or unreasonable applications of *Strickland v. Washington.*

### G. Claim 7: Failure to Present Testimony by Eyewitness Expert

 Madrigal argues in his seventh claim that his attorneys failed to provide effective assistance at trial when they did not present testimony by an eyewitness expert. Much of the prosecution's case relied on eyewitness identifications of Madrigal. Madrigal contends that the strength of the state's case was based on false assumptions about the accuracy of eyewitness testimony. He further asserts that he could have revealed the fallacies of these assumptions if his counsel had hired an expert on eyewitness testimony.

Bagley responds that failing to hire an eyewitness expert is not *per se* ineffective assistance of counsel. She further says that Madrigal's attorneys made a tactical decision to hire a ballistics expert rather than an eyewitness expert, relying instead on cross-examination of the eyewitnesses to refute the eyewitness identifications. Finally, she contends that no prejudice resulted from counsel's failure to hire an eyewitness expert.

The state courts rejected this claim holding that Madrigal's counsel were not deficient in relying on cross-examination to impeach the eyewitnesses' identifications rather than hiring an expert. This Court determines if the state trial and appellate courts' decisions are contrary to or an unreasonable application of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

The first prong of the *Strickland* test requires Madrigal to establish deficient representation by counsel. This requires a showing that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* According to the Court in *Strickland:*

> Judicial scrutiny of counsel's performance must be highly deferential.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption

that, under the circumstances, the challenged action might be considered sound trial strategy. *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). Thus, to constitute deficient representation, counsel's actions must be more than failed tactical decisions.

■ Under Ohio law, defense counsel does not have to hire an expert identification witness. Instead, he may rely on cross-examination and closing arguments to impeach eyewitness testimony. *See State v. Pattin*, No. L–91–339, unreported (Lucas Cty Ct.App. Aug. 7, 1992). Many federal courts have also held that cross-examination of eyewitnesses is a sufficient method of attempting to deal with the issues presented by eyewitness testimony. *See United States v. Christophe*, 833 F.2d 1296, 1300 (9th Cir.1987) (holding that "skillful cross examination of eyewitnesses, coupled with appeals to the experience and common sense of jurors, will sufficiently alert jurors to specific conditions that render a particular eyewitness identification unreliable"); *Hughes v. Hubbard*, 2000 WL 1728113, 2000 U.S.App. LEXIS 297324 (9th Cir.2000) (holding that "cross examination of witnesses is sufficient to alert jurors to specific conditions that render eyewitness identification unreliable").

Here, Madrigal's lead counsel, Klucas, believed that cross-examination and summation would be sufficient to deal with the issue of eyewitness unreliability. Klucas Depo. at 10. In his cross-examinations and closing arguments, he highlighted the inconsistencies in the eyewitness descriptions of Madrigal.

Klucas also explained that he did not request funding for an eyewitness expert because he needed funding for a ballistics expert and did not think that the court would fund both experts:

Q.: Why did you not request funding for an eyewitness expert?

A.: At the time of this trial the judges weren't quite as loose with the money as they are now. We had received a fair amount of money up to that point. I felt that I needed the money for a ballistics expert which we secured and I was confident that I could accomplish what needed to be accomplished with the eyewitness through cross-examination.

Klucas Dep. at 10.

In hindsight, the eyewitness testimony may have been more important to the prosecution than ballistics evidence, but the best strategy is not always clear beforehand. Further, "[t]here are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Strickland*, 466 U.S. at 689, 104 S.Ct. 2052. Therefore, the Court concludes Madrigal's attorneys were not deficient for strategically deciding to call one type of expert rather than another, and relying on cross-examination to impeach the eyewitness identifications.

In sum, Madrigal does not satisfy the first prong of the *Strickland* test. Klucas determined that the best use of his client's limited resources was to hire a ballistics expert and to deal with the issue of eyewitness unreliability on cross-examination and at summation. Madrigal now argues that counsel ought to have done the opposite, that he should have relied on cross-examination and summation to deal with the ballistic issues and hired an expert witness on eyewitness testimony. This type of retrospective strategizing does not form the basis of a legitimate claim for ineffective assistance of counsel. In evaluating the first prong of the *Strickland* test, courts "should keep in mind that counsel's function, as elaborated in prevailing pro-

fessional norms, is to make the adversarial testing process work in the particular case." *Strickland,* 466 U.S. at 690, 104 S.Ct. 2052. Counsel's actions preserved that adversarial process at Madrigal's trial. Counsel did not leave the testimony of the eyewitnesses unchallenged. Accordingly, Madrigal's counsel was not deficient as necessary to satisfy the first prong of the *Strickland* test.

Assuming *arguendo* that Madrigal had shown deficient performance, which he has not, he does not establish prejudice. Klucas used cross-examination to highlight the inconsistencies in the eyewitnesses' descriptions and Madrigal's appearance. During cross-examination, Klucas established that no eyewitness described Madrigal as having a beard, mustache, goatee, or any type of facial hair even though Madrigal has facial hair. He also brought out the fact that one eyewitness chose another individual in a police lineup before the police arrested Madrigal. Additionally, Klucas focused on the severe stress that the eyewitnesses underwent at the time they formed their impression of what the shooter looked like. He showed that the eyewitnesses had limited time to see the assailant and an obstructed view of the assailant's face. Finally, Klucas established that many witnesses spent more time looking at the gun than the criminal's face. Klucas also reiterated all of these points in closing argument.

The Court accordingly denies Madrigal's seventh claim.

### H. Claim 8: Failure to File Motion to Suppress

■ With his eighth claim, Madrigal challenges his trial counsel's failure to file a motion to suppress evidence taken from a closed container without Madrigal's consent during his arrest. The evidence included clothing, a gun, and bullets. In preparation for trial Madrigal's two attorneys disagreed about whether to file such a motion. Initially, his counsel filed the motion, but they then withdrew the motion to suppress. Madrigal contends that his attorneys should not have withdrawn the motion to suppress.

After reviewing this claim, the Ohio Supreme Court found no constitutional error, holding that counsel's decision not to file a motion to suppress was a permissible tactical decision.

The Court evaluates whether the Ohio Supreme Court's decision was contrary to or an unreasonable application of *Strickland v. Washington* and *Kimmelman v. Morrison,* 477 U.S. 365, 384, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986).

The United States Supreme Court bars Fourth Amendment claims in habeas proceedings. *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). However, petitioners may claim their trial counsel was ineffective in failing to file a motion to suppress physical evidence. *Kimmelman,* 477 U.S. at 382–383, 106 S.Ct. 2574. Therefore, Madrigal's claim is cognizable. However, Madrigal must still show deficient performance and prejudice under the *Strickland* standard. For the reasons discussed below, he fails to do so.

Failure to file a motion to suppress evidence does not constitute *per se* ineffective assistance of counsel. *Kimmelman,* 477 U.S. at 384, 106 S.Ct. 2574. To constitute deficient representation, counsel's actions must be more than failed tactical decisions. *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. The decision to withdraw the motion to suppress appears to have been a tactical decision by Madrigal's attorneys, Klucas and Thebes. Klucas and Thebes disagreed regarding the motion to suppress. In a letter from Thebes, the second-chair attorney, to Klucas, the first-chair attorney, Thebes said:

I must make one final pitch to you regarding the motion to suppress (Cleveland) and my belief that we could benefit from a hearing. I feel that the benefit of a hearing, i.e. keeping out the gun and clothing, far outweighs the risk of having the hearing. Also, I further feel that a continuance would allow us more time to consolidate an even better defense than we currently possess. *I understand the reasons for your position, however I feel that if the state does not know presently of what we fear, they will never know, and it is worth the risk of having the motion heard and getting a continuance if necessary.*

Please understand that I realize that the final decision rests with you and I also realize that for all intent and purposes the final decision has been made per our discussions concerning this matter. However, my experience as a criminal attorney, which has placed me in this position of defending Mr. Madrigal, motivates me to detail my thoughts for you in this regard.

App. to Return of Writ, Vol V., Ex. 1 at 102–103 (Emphasis added). The letter shows that tactical considerations motivated the decision to withdraw the motion to suppress. Thebes alludes to a tactical benefit to keeping the case going forward to trial: "the state does not know presently of what we fear." After considering the advantages and disadvantages of the motion to suppress, Klucas determined that the benefit of withdrawing the motion to suppress outweighed the risk. This is a tactical decision. As the Ohio Supreme Court reasoned, "the fact that counsel filed a motion for leave to file a motion · to suppress, and later withdrew that motion, is compelling evidence of a tactical decision. It is not mere speculation to presume that defense counsel obtained information concerning the suppression motion that led to its withdrawal." App. to Re-

turn of Writ, Vol. IV (Ohio Supreme Ct. Direct B), Ex. 11 at 127.

Even if Madrigal met the deficient representation prong, Madrigal's claim still fails the *Strickland* test because he does not show prejudice. To establish prejudice, the petitioner must show that the alleged error was "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. But as Justice Powell has observed, Fourth Amendment claims, by their very nature, do not affect the reliability of the proceedings. Instead, the suppression of evidence usually hurts the reliability of the proceedings by excluding relevant and probative evidence of the defendant's guilt or innocence. *Kimmelman,* 477 U.S. at 396, 106 S.Ct. 2574 (Powell, J., concurring) (noting that "exclusion of illegally seized but wholly reliable evidence renders verdicts less fair and just" and "the harm suffered by respondent in [an illegal search and seizure] case is not the denial of a fair and reliable adjudication of his guilt, but rather the absence of a windfall"); *see also Holman v. Page,* 95 F.3d 481, 491–92 (7th Cir.1996), *cert. denied,* 520 U.S. 1254, 117 S.Ct. 2414, 138 L.Ed.2d 179 (1997) (holding that habeas petitioner cannot show prejudice to sustain ineffective assistance claim when the Fourth Amendment is the basis for the ineffective assistance claim).

Moreover, beyond the inherent difficulty of showing prejudice generally in failure to suppress evidence cases, Madrigal fails to show prejudice. The prosecution could not conclusively link the gun found in Madrigal's bag to the crime. Therefore, the possibility that the trial court might have excluded the physical evidence does not undermine confidence in the trial's outcome. For this reason, Madrigal's eighth claim fails to satisfy the second prong of the *Strickland* test.

Because Madrigal has failed to show that his counsel were deficient in not filing a motion to suppress and that their failure to file such a motion prejudiced him, the Court denies his eighth claim.

### I. Claim 9: Failure to File Change of Venue Motion

 As grounds for his ninth claim, Madrigal argues that his trial counsel denied him effective assistance when they did not file a motion for a change of venue. Specifically, he says that the notoriety, the political atmosphere, and the racial climate in Lucas County deprived him of his ability to receive a fair trial.

During state post-conviction proceedings, the state trial court applied the res judicata doctrine to stop consideration of the claim. However, the state appellate court reached the merits of the claim, finding that the claim failed because Madrigal did not show prejudice. The Ohio Supreme Court declined to exercise jurisdiction over Madrigal's subsequent appeal. Therefore, the Court decides whether the state appellate court's decision was contrary to or an unreasonable application of *Strickland v. Washington.*

In determining whether pre-trial publicity warrants a change of venue because a defendant would otherwise not get a fair trial, the Supreme Court decision in *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), controls. *Irvin v. Dowd* describes the standard: "It is not required ... that the jurors be totally ignorant of the facts and issues involved.... It is sufficient if the jurors can lay aside his/her impression or opinion and render a verdict based on the evidence presented in court." *Id.* at 722–723, 81 S.Ct. 1639. The Sixth Circuit has stated, "A juror's exposure to news accounts about the crime charged, standing alone, does not presumptively establish that the defendant was denied a fair trial." *United*

*States v. Chambers,* 944 F.2d 1253, 1262 (6th Cir.1991). "Accordingly, if the trial court takes steps to insure that the impaneled jurors are able to lay aside any preconceived impressions about the case and consider only the evidence adduced at trial, a change of venue is not warranted." *United States v. Gough,* 1999 WL 183474, *4, 1999 U.S.App. LEXIS 4680, *14 (6th Cir.1999).

Here, Madrigal identifies nothing in the record that shows the trial court did not conduct the proper test to insure that Madrigal's jury was impartial. Instead, a review of the record shows that the trial court took steps to ensure that the jurors could fairly consider the evidence presented. The trial court consistently asked the jurors, "Do you know anything from the media, newspaper, television, radio about this case? It may have been described as the Kentucky Fried Chicken case?" Tr. Vol. II (Trial) at 100–101; 108; 125; 133;142; 153; 161; 173. If the prospective juror indicated he or she had heard about the case, the trial court or one of the attorneys questioned the juror "Would you be able to put aside anything that you may have heard already and to solely concentrate on the evidence which would come from the courtroom if you were selected." Tr. Vol. II (Trial) at 101; 113; 116; 126; 154;135; 162. As the state appellate court noted:

> The trialrecord shows that each potential juror was asked about previous knowledge and impressions of this case that they formed from media reports, both from broadcasts and from reports in print. While some jurors indicated that they did have some memory of reports about a robbery and murder at a Kentucky Fried Chicken restaurant, all of the jurors selected indicated that they could set aside all that they learned through media coverage and could base

their verdict solely on the evidence heard at trial.

App. to Return of Writ, Vol. VIII (Ct. of App. Post-conviction), Ex. 31 at 488–90.

Finally, Madrigal points to nothing that would show that the jurors had exposure to media publicity greater than that allowed in *Chambers.* Therefore, Madrigal fails to show that prejudice resulted to him from his counsel's failure to seek a change of venue.

Accordingly, the Court denies Madrigal's ninth claim.

### J. Claim 10: Ineffective Assistance of Counsel During Voir Dire

With Claim 10, Madrigal contends that his counsel's performance during voir dire violated his constitutional right under the Sixth Amendment to effective assistance of counsel. The trial court excused two prospective jurors, Mary San Miguel ("Miguel") and Carol Bartok ("Bartok"), for cause because they expressed reservations about imposing a death sentence. Madrigal argues that his counsel did not sufficiently object to the challenge of these jurors or make sufficient efforts to rehabilitate them. Respondent Bagley responds that the court was correct in dismissing the potential jurors in question. She further asserts that, even if the trial court had not been correct, counsel's performance at voir dire did not constitute deficient representation. Finally, Bagley alleges that Madrigal has not shown prejudice.

The Ohio Supreme Court rejected Madrigal's claim, finding that the trial court properly excused both jurors and that Madrigal's attorney did not render ineffective assistance. This Court now determines whether the Ohio Supreme Court's denial of this claim on direct appeal was contrary to or an unreasonable application of *Strickland v. Washington, Buchanan v. Kentucky,* 483 U.S. 402, 107 S.Ct. 2906, 97

L.Ed.2d 336 (1987), and *Wainwright v. Witt.*

To maintain an ineffective assistance of counsel claim, Madrigal must prove both deficient representation and prejudice. *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. Madrigal's claim for ineffective assistance of counsel fails on both prongs of the *Strickland* analysis.

A trial court should excuse a potential juror for cause because of his or her views on capital punishment where the juror's views would "prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Wainwright,* 469 U.S. at 424, 105 S.Ct. 844. During voir dire in Madrigal's case, later-excused juror San Miguel expressed concerns about imposing the death penalty:

> THE COURT: If the death penalty were appropriate, would you be able to vote for the death penalty?
>
> MS. SAN MIGUEL: I don't honestly know that.
>
> THE COURT: Then the question would be, on the other hand, if you found that it was not appropriate, would you be able to vote against the death penalty?
>
> MS. SAN MIGUEL: I think it's one of those things I don't know until I'm in the situation. You know, I know what I feel what I would do, but I don't know one hundred percent what I would do in that situation.
>
> THE COURT: And your feeling is toward what?
>
> MS. SAN MIGUEL: My feeling is probably towards I would not be able to vote for it.

Tr. Vol. IV (Trial) at 662. As the trial judge questioned San Miguel further, she became more resolute in saying that she might have a moral problem imposing the death penalty:

THE COURT: Depending on the evidence, if you follow the law, you may have to impose a sentence of death. Can you guarantee us here today that you would be able to follow the law if that is what is required of you?

MS. SAN MIGUEL: I can't guarantee that I could in good conscience do that.

MR. MANDROSS: So it may be possible that you'd find yourself in a position where the law requires you to do one thing but your conscience–conscience would prohibit you from doing that?

MS. SAN MIGUEL: I may find myself in that position, right.

Tr. Vol. IV (Trial) at 669.

After this exchange with the trial court, Klucas attempted to rehabilitate potential juror San Miguel:

MR. KLUCAS: Now the Court is going to give you, if you're selected as a juror in this case, a good deal of evidence on this issue. After considering all of the evidence that's put before you as a juror, if you're selected, at the conclusion of that evidence, the Court is going to give you some very clear instructions as to how you are to apply that evidence to the law.

Okay. For the good of society. Could you follow those instructions that the Court gives you, and if the evidence requires, according to the instructions, cast your verdict in favor of the death penalty; could you do so, for the good of society?

Tr. Vol. IV (Trial) at 665. Despite Klucas's attempt at rehabilitation, San Miguel was ultimately unable to say that she was comfortable applying the law if that meant imposing the death penalty:

MS. BATES: Can you guarantee us here today that you would be able to follow the law if that is what is required of you?

MS. SAN MIGUEL: I can't guarantee that I could in good conscience do that.

Tr. Vol. IV (Trial) at 669. Finally, Madrigal's counsel objected to the excusal of San Miguel. Tr. Vol. IV (Trial) at 670. Accordingly, Klucas' treatment of San Miguel during voir dire is not ineffective assistance of counsel.

Prospective juror Bartok expressed similar concerns about whether she would be able to impose the death penalty:

THE COURT: Could you tell us about your ability to serve as a juror for approximately four weeks?

MS. BARTOK: I feel very strongly about the death penalty, and I do think that I couldn't do that, Judge.

. . .

THE COURT: Are you telling me that there is absolutely no situation?

MS. BARTOK: I don't think that I could do it.

THE COURT: Okay. You thought about it really hard?

MS. BARTOK: Yes, I have.

THE COURT: Even if the law and evidence were such that said you should?

MS. BARTOK: Yes. I would always feel that I–I've always had this feeling in the back of my mind, well, what if I convicted somebody, gave them the death sentence and then later on down the line they were found innocent? I would feel so badly about that. I don't think I could live with that.

Tr. Vol. IV (Trial) at 579–580.

Unlike with San Miguel, Klucas did not attempt to rehabilitate Bartok, nor did he object to her excusal. That does not, however, constitute deficient representation. "The conduct of voir dire by defense counsel does not have to take a particular form, nor do specific questions have to be asked." *State v. Evans,* 586 N.E.2d 1042, 1056, 63 Ohio St.3d 231, 247 (1992). Ohio courts have also held that "even if defense

counsel did not question some of the prospective jurors, this decision falls within the range of reasonable professional assistance." *State v. Hamm,* 2000 WL 288604, 2000 Ohio App. LEXIS 1099 (citing *State v. Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373 (1989)). As the Ohio Supreme Court noted in *Bradley,* 42 Ohio St.3d 136, 538 N.E.2d 373, "Counsel were present for voir dire and could see and hear the jurors answer questions. Appellant's counsel were in a much better position to determine if the jurors could be 'rehabilitated' than is this court. This is within the scope of acceptable practice envisioned in *Strickland.*" *Bradley,* 42 Ohio St.3d at 143, 538 N.E.2d at 381.

Here, Klucas watched the exchange between the trial judge and Bartok. Bartok stated that she could not guarantee that she could follow the law in applying the death penalty. Tr. Vol. IV (Trial) at 579–80. Under the *Wainwright* standard, the trial court had discretion to remove Bartok for cause because of her inability to serve as a juror in accordance with the trial court's instructions and her oath. *Wainwright,* 469 U.S. at 424, 105 S.Ct. 844. As an observer of the exchange, Klucas was in a better position than this Court to determine if Bartok could be rehabilitated. Accordingly, Klucas's decision not to attempt to rehabilitate Bartok after viewing the trial judge's exchange with Bartok is not ineffective assistance of counsel.

Because Madrigal has not shown deficient representation, his claim of inefficient assistance of counsel at voir dire fails. However, even if Madrigal had shown deficient representation with regard to counsel's conduct during voir dire, his claim still fails to meet the second prong of the *Strickland* test because Madrigal has not shown that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S.

at 694, 104 S.Ct. 2052. Accordingly, the Court denies Madrigal's tenth claim.

### K. Claim 11: Investigation & Presentation of Mitigation Evidence

■ Next, Madrigal challenges his trial counsel's investigation and presentation of mitigation evidence. Specifically, he says that his counsel was ineffective in four areas: 1) hiring an ineffective and unavailable mitigation specialist; 2) presenting unprepared and damaging lay witnesses; 3) offering damaging expert witness testimony; and 4) incongruously arguing residual doubt while conceding Madrigal's guilt.

The state trial court denied Madrigal's request for an evidentiary hearing on his claims that his trial counsel was ineffective during the mitigation hearing. The appellate court affirmed the trial court, reasoning that the affidavits in support of Madrigal's petition contained evidence that was cumulative to the testimony presented during the mitigation hearing. Therefore, the appellate court concluded that Madrigal failed to show that his attorney's representation fell below an objective standard of reasonable representation.

The Court determines if the state decisions are contrary to or an unreasonable application of *Strickland v. Washington* and examines each argument below.

#### Ineffective & Unavailable Mitigation Specialist

First, Madrigal asserts that his trial counsel were ineffective because they hired an ineffective mitigation specialist who they knew would be unavailable at the time of trial. In early September 1996, approximately one month before trial, Klucas hired Karen Fischer as a mitigation specialist after unsuccessfully trying to hire two other more experienced mitigation specialists. At the time, Fischer was pregnant and her due date, October 7, 1996, coincided with the start of the trial.

She informed Klucas and Thebes of this scheduling conflict. Despite this conflict, Klucas hired Fischer because no one else was available. Although Fischer had no experience as a mitigation specialist, Klucas chose her because:

> She was a former member of the Wood County Public Defenders Office. She does and did a great deal of juvenile court work, abuse, dependency, neglect, guardian ad litem type things and is unconditionally opposed to the death penalty.

Additionally, Klucas knew Fischer from when she clerked for the law firm that Klucas worked at.

Given the unavailability of the more experienced mitigation specialists, Fischer's work with abused children, and Klucas' familiarity with Fischer's professional background, this Court concludes that Klucas did not fall below an objective standard of care in selecting Fischer as the mitigation specialist.

Even if Klucas had been deficient in hiring Fischer, which this Court has found he was not, Madrigal does not show prejudice. Madrigal argues that Fischer's lack of involvement and availability at trial and sentencing prejudiced him. He says, that as a result of Fischer's inexperience and unavailability, no one contacted nine friends and family. According to Madrigal, these nine witnesses would have testified about his abuse, abandonment, bouts of depression, substance abuse, and his love for his children. He particularly complains that Klucas did not contact or offer the testimony of his maternal relatives although they had important mitigation evidence about his substance abuse and his mother's drug dependency. According to Madrigal, they also would have testified about the neglect and abuse that he suffered from his mother.

Although all of Madrigal's family and friends did not testify at the mitigation hearing, Klucas offered three lay witnesses and one expert witness, Dr. Layne, to discuss Madrigal's difficult childhood. The three lay witnesses were James Burel, Sr. ("Burel"), the man believed to be Madrigal's biological father, Christine Dunn ("Dunn"), one of Madrigal's stepmothers, and Jodi Turner ("Turner"), another stepmother.

Dr. Layne testified about all of the mitigating factors that Madrigal contends his maternal relatives would have testified about. Specifically, Dr. Layne testified that Madrigal had had an unstable childhood, moving frequently and attending eight different schools. He believed that this "chaotic" upbringing caused Madrigal to develop a personality disorder with antisocial traits and borderline intellectual functioning. Dr. Layne also stated that Madrigal had failed the third grade, dropped out of school in the ninth grade, and later earned his GED. Additionally, he discussed the fact that Madrigal's mother, father, and other caretakers shuffled him back and forth. He also talked about Madrigal's abuse by his caretakers and his caretakers' substance addictions. Dr. Layne mentioned that Madrigal had a substance abuse problem himself. Finally, Dr. Layne testified about Madrigal's struggle with his biracial identity. Tr. Vol. XIII (Mitigation & Sentencing) at 158–176.

While they did not provide as much detail as they apparently possessed, three of Madrigal's friends and family who knew about his childhood, Burel, Dunn, and Turner, testified. They corroborated Dr. Layne's testimony. Madrigal attacks this testimony as damaging because the three stated that Madrigal had a normal childhood. Specifically, in response to the question, "Now, while Jamie [Madrigal] was living with you, could you tell the jury what Jamie's routine was in a general day-to-day sense?", Dunn responded "he was a

normal child. Get up and eat and play and go outside and play with his sister Shantay. And he went to school everyday and he didn't do anything out of the ordinary." Tr. Vol. XIII (Mitigation & Sentencing) at 84–85. Likewise, instead of discussing Madrigal's unstable childhood, Burel said that Madrigal lived "a regular normal teenage life." However, Burel contradicted himself by later saying that he (Burel) "used to be in the streets. A lot. And, um, I got really neglectful as far as Jamie went ... I thought more of what I was doing in the streets than I did of my son." Tr. Vol. XIII (Mitigation & Sentencing) at 111. Further, Dunn and Turner's testimony about Burel's drug abuse and Madrigal's mother's neglect of him contradict Burel's claim that Madrigal had a normal teenage life.

While testifying that a portion of Madrigal's childhood was normal, the bulk of the Dunn's, Burel's, and Turner's testimony described the chaos and abuse that Madrigal suffered.

Mitigation witness Dunn testified about Madrigal's father's abuse of drugs while Madrigal lived with them. Tr. Vol. XIII (Mitigation & Sentencing) at 80. She also stated that Madrigal's mother abandoned him at his father's home when Madrigal was seven or eight. Madrigal lived with Dunn and Burel from the time he was seven or eight until he was twelve or thirteen. Dunn also discussed her belief that Madrigal's mother and her boyfriend abused Madrigal:

> [W]hen Jamie was 7, he would have bruises on the side of his leg. They were really thick and black and blue and purple. And when I would get him ready to go get his bath, I noticed them. And I asked him who did that to him and he said his mom's boyfriend Gulley did it. And then, um, he had went home and he came back again and he had the same bruises. They were new bruises, but

they were in the same spot. And this time he said that his mother did it. And he said they would make him hang up on a bar in the bathroom and beat him with a belt.

Tr. Vol. XIII (Mitigation & Sentencing) at 82.

Finally, she testified that Madrigal's mother was unreliable and would not fulfill her promises to visit him while Madrigal lived with Dunn and Burel. Tr. Vol. XIII (Mitigation & Sentencing) at 83–84.

Similarly, mitigation witness Turner testified about Madrigal's unstable and difficult childhood. She recalled that while Madrigal lived with her and his father, she and Burel were using crack cocaine. Because of their drug abuse, she stated that she and Burel would lock Madrigal out at night. Specifically, she stated "there were times when Jamie wasn't able to come home because we were partying, that we would leave him out 'till one, two o'clock in the morning. He would come back and we would say, well, go here and come back in about an hour." Tr. Vol. XIII (Mitigation & Sentencing) at 89. Madrigal was thirteen at the time.

Madrigal contends that all of this testimony did him more harm than good. The Court disagrees. The testimony consistently focused on Madrigal's neglect, abuse, and unstable childhood. Further, while a small portion of the testimony suggested that Madrigal may have had some normalcy in his upbringing, on the whole the testimony showed that Madrigal had a chaotic and difficult childhood.

Therefore, the Court concludes that Klucas was not deficient in hiring Fischer as a mitigation specialist. Even if he was, Madrigal does not show prejudice.

### Presenting Unprepared and Damaging Lay Witnesses

Madrigal also challenges his counsel's selection and preparation of witnesses dur-

ing the mitigation phase. He says that his counsel should have contacted nine available relatives and friends. He also questions whether the three lay witnesses presented by Klucas were effective. Finally, Madrigal asserts that Klucas failed to adequately prepare these witnesses for the mitigation hearing.

In general, Klucas used the following approach to the sentencing phase of a capital murder case:

> I look at the statute listing the mitigating factors, I determine who amongst the defense team, whether it would be me, co-counsel or somebody we would hire, would be in the best position to acquire information on any of the particular factors, determine which factors may be applicable, which may not; go out and secure the information, evaluate it and see if it's a factor that we could raise in the second phase without any real risk of it blowing up in our face.

Klucas Dep. at 18–19.

With these factors in mind and after discussing mitigation with local death penalty attorneys, Klucas says that he made a strategic choice in selecting Burel, Dunn, and Turner to testify in Madrigal's case. As to his choice to offer Burel's testimony, Klucas stated:

> I wanted to elicit testimony from Mr. Burel because I thought that the lack of structure and what appeared to me to be the absence of parental guidance on an appropriate value system was mitigating. I think Jamie's [Madrigal's] upbringing was mitigating. And Mr. Burel I thought was a good witness from whom to elicit that sort of testimony.

Klucas Dep. at 17. Klucas also said that he had the same objective in mind with Dunn's testimony.

Additionally, Klucas attempted to prepare the mitigation witnesses. He testified that he discussed testimony with all the mitigation phase witnesses beforehand except for Burel. In Burel's case, Klucas stated that he was only able to talk to him right before his testimony because Burel was "incarcerated on a somewhat regular basis and was difficult for [Klucas] to get to." Klucas Dep. at 12. In fact, at the time of the trial, Burel was incarcerated in the Sandusky County jail for drug trafficking.

While in hindsight, Klucas may have been better served to present Madrigal's maternal family members as witnesses, Klucas' decision to offer the testimony of his three other witnesses is not unreasonable.

To the extent that Madrigal relies on *Austin v. Bell,* 126 F.3d 843 (6th Cir.1997), it is distinguishable. In *Austin,* the defense counsel failed to investigate or present any mitigating witnesses or evidence because he believed it would not be beneficial. *Austin,* 126 F.3d at 848. The Sixth Circuit held that this failure to present available mitigating evidence was an unconstitutional "abdication of advocacy" rather than a strategic decision. *Id.* Here, Klucas did not fail to present any mitigating witnesses. Instead, he strategically chose the witnesses he thought would be most effective in establishing the statutory mitigating factors. Madrigal fails to show that his trial counsel was ineffective or that he was prejudiced by the selection and presentation of mitigation witnesses.

### Offering Damaging Expert Witness Testimony

Additionally, Madrigal contends that his trial counsel were ineffective at the sentencing phase by failing to investigate Dr. Layne's previous testimony. He also says Klucas and Thebes should not have presented Dr. Layne as an expert defense witness. Madrigal relies on *Skaggs v. Parker, Glenn v. Tate, Combs v. Coyle,* and *Powell v. Collins* as support for this assertion.

During the mitigation hearing, besides his testimony about Madrigal's unstable childhood, Dr. Layne testified that Madrigal was "lazy," "unproductive," "superficial," "impulsive," "self-centered," and "callous." He also stated that Madrigal had a "me-first attitude" and that he "like[d] to dominate others," was "not constrained by laws and rules," "craves excitement," and was "looking out for himself." Tr. Vol. XIII (Mitigation & Sentencing) at 172–73.

Madrigal attributes this negative testimony to this attorneys' failure to investigate Dr. Layne's previous testimony. As support, he attaches the affidavit of Karen Fischer. Based on Fischer's observation of Dr. Layne in two other capital cases, Fischer states:

> I had seen him [Dr. Layne] testify in capital cases on two previous occasions and thought that he was very helpful to the prosecution even though he was testifying on behalf of the defendants. I have reviewed his testimony from the Madrigal mitigation hearing and it was consistent with the way I had seen him testify in the other cases. At a time when he was supposed to be humanizing Jamie and trying to save his life, Dr. Layne was presenting personality traits that supported the prosecution's case.

Fischer Decl. at 4. Klucas and Thebes did not seek Fischer's input in hiring Dr. Layne.

As to an attorney's failure to investigate the background of an expert witness, the Supreme Court has held:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to

make a reasonable decision that makes particular investigations unnecessary.

*Strickland,* 466 U.S. at 690–91, 104 S.Ct. 2052.

Here, Klucas testified that Dr. Layne was not his first choice as an expert. Once he discovered that his first expert choice was unavailable, Klucas contacted Dr. Layne based on co-counsel Thebes' recommendation. Thebes had used Dr. Layne's services to prepare a competency evaluation in a previous non-capital murder case. Dr. Layne did not testify in that case. He only provided a competency evaluation. Klucas did not conduct a thorough investigation of Dr. Layne's background. He did not review any transcripts of Dr. Layne's testimony in other cases or talk to other attorneys about their experience with Dr. Layne's services. Instead, he met with Dr. Layne and reviewed his curriculum vitae. Based on this meeting and review as well as Thebes' previous positive experience with Dr. Layne, Klucas hired Dr. Layne as an expert witness.

A more thorough investigation into their expert witness would have been ideal. However, given Klucas' interview of Dr. Layne and Thebes' past experience with Dr. Layne, Madrigal's attorneys' failure to conduct a full investigation into Dr. Layne's past testimony does not fall below an objective standard of reasonableness.

Madrigal misplaces his reliance on *Skaggs v. Parker, Glenn v. Tate, Combs v. Coyle,* and *Powell v. Collins.* In *Skaggs,* the court held that a capital murder defendant received ineffective assistance of counsel during the sentencing phase of the trial where his attorney presented the testimony of an incompetent and fraudulent expert witness as the sole mitigation evidence. *Skaggs v. Parker,* 235 F.3d 261, 270 (6th Cir.2000). Critical to the *Skaggs* court's reasoning was the fact that the attorney offered the expert testimony as

the sole mitigation evidence after observing the expert's disastrous testimony during the guilt phase. *Id.* The court held that the attorney did not fall below an objective standard of care in using the expert during the guilt phase without a thorough investigation into the expert's background. *Id.* However, the *Skaggs* court further found that the attorney did provide ineffective assistance by using the same expert at the mitigation phase. *Id.* Specifically, the *Skaggs* court reasoned:

> Despite acknowledging that Bresler was not a competent witness and, in fact, made a mockery of the first trial, defense counsel nevertheless called him to testify at the second penalty phase, primarily because counsel waited until the eleventh hour to prepare for the penalty phase and to line up a psychiatric expert to testify on Skaggs's behalf. Counsel's decision to call Bresler at the retrial of the penalty phase, despite their belief that Bresler's testimony could realistically be more harmful than helpful, simply because counsel believed it would not be worth their time to request additional money from the court, cannot be deemed to have been a reasonable exercise of professional judgment. Because defense counsel failed to introduce other competent mitigation evidence, they essentially failed to put on any mitigation evidence at all. Thus, we hold that counsel's decision to present Bresler's testimony as crucial mitigating evidence at the penalty phase of the trial, having had the advantage of witnessing Bresler's previous bizarre performance and, more importantly, counsel's complete failure to present other mitigating evidence on Skaggs's behalf, fell below an objective standard of reasonableness.

*Id.* at 270.

Here, however, Klucas did not know that Dr. Layne's testimony would be damaging. He did not offer Dr. Layne's testimony during the guilt phase. Additionally, he had reviewed Dr. Layne's expert report before the sentencing phase. During this review, he did not find any damaging conclusions in the expert report. He had also discussed Dr. Layne's testimony with him before the sentencing phase. Although in Klucas' post-trial opinion, Dr. Layne's testimony was "an unconditional disaster," Dr. Layne's mitigation testimony was contrary to Klucas' pre-trial discussions with him. Specifically, Klucas did not know that Dr. Layne would testify that Madrigal was callous, impulsive, and had a me-first attitude even though Klucas had previously discussed Dr. Layne's diagnosis with him. Finally, unlike the *Skaggs'* attorney, Klucas offered three mitigating witnesses beyond Dr. Layne.

*Glenn v. Tate,* 71 F.3d 1204 (6th Cir. 1995), is also distinguishable. In *Glenn,* the court held that counsel provided ineffective assistance of counsel when he failed to present mitigating evidence during the sentencing phase. *Id.* The *Glenn* court found important the fact that counsel had made almost no attempt to prepare for the sentencing phase. *Glenn,* 71 F.3d at 1206–08. Unlike the *Glenn* attorney who relied on a damaging expert report without calling the expert as a witness, Klucas called Dr. Layne as an expert. Further, unlike the *Glenn* attorney, Klucas had reviewed the expert report and did not know that Dr. Layne's testimony would be damaging. Additionally, the *Glenn* defense counsel did not try to obtain an expert until after the end of the guilt phase of the trial. *Glenn,* 71 F.3d at 1208. Klucas hired Dr. Layne before the trial began rather than at the last minute.

*Combs v. Coyle,* 205 F.3d 269 (6th Cir. 2000), and *Powell v. Collins,* 332 F.3d 376 (6th Cir.2003), are also distinguishable. First, Dr. Layne was not the only mitigation witness. Madrigal's biological father and his two step-mothers also testified.

Additionally, in *Combs,* the defense expert's testimony was not only important mitigation testimony, but was crucial to disproving intent, an essential element during the culpability phase. *Combs,* 205 F.3d at 287–88. In *Powell,* defense counsel spent only two full business days to prepare for the mitigation phase and waited until the end of the guilt phase of the trial to do so. *Powell,* 332 F.3d at 398–99. The sole mitigation evidence was the defense expert who had testified during the guilt phase that the defendant had the capacity and intent to commit murder. *Id.* at 398–99. Defense counsel also did not interview any of the defendant's family and friends. Here, Klucas interviewed some of the family and friends, making a strategic choice as to who he thought the most effective mitigation witnesses would be. In sum, while Dr. Layne may not have been the best choice, the decision to hire him and offer his testimony as evidence was not an "error so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052.

Finally, Madrigal does not show prejudice. While Dr. Layne's testimony did contain damaging aspects, he also presented valuable mitigation evidence about Madrigal's "chaotic" childhood, unstable upbringing, child abuse, and his struggle with his biracial identity. Dr. Layne also spoke about Madrigal's caretakers' drug abuse and Madrigal's own alcohol abuse. Although the prosecution established much of Dr. Layne's testimony was based on Madrigal's account of his childhood, Madrigal's attorneys did successfully enter some additional corroborating records about Madrigal's upbringing. Additionally, Dunn, Burel, and Turner all corroborated most of Dr. Layne's testimony.

### Cultural Expert

Madrigal also argues that his counsel was ineffective by not hiring a cultural expert. According to Madrigal, a cultural expert would have helped the jury to understand the pain and confusion that Madrigal's ethnic background caused him.

Klucas' failure to introduce a cultural expert was not deficient performance because he presented this evidence through other means. Dr. Layne discussed Madrigal's struggle with his biracial identity and his resulting confusion. He stated:

He was aware that his mother was Hispanic and that his stepfather and his biological father were both black. He also told me that—again, it gets a little confusing—but that's the nature of this—of this case—that his stepfather, Jimmy, who was one of the more regular sources of adult relationship to him, Jimmy generally dated white women. His Hispanic mother generally dated black men. There was a time when some other male in Jimmy's—in Jamie Madrigal's life urged him to stop seeing himself as primarily black and to acknowledge his Hispanic roots as well. . . . So again, if all of this sounds very confusing, it is to me too. The point that I'm trying to make is that while he was shifting from home to home, there was a sense that he had—that he hardly knew what race he was, and it was important to him.

Tr. Vol. XIII (Mitigation & Sentencing) at 168–69. This evidence sufficiently addressed Madrigal's ethnic background.

### Incongruously Arguing Residual Doubt

Finally, Madrigal alleges that his counsel's performance was ineffective because Klucas incongruously argued residual doubt as a mitigating factor while at the same time expressing an unqualified acceptance of the jury's guilty verdict.

Specifically, Madrigal objects to Klucas' opening statements during the mitigation hearing, "I'm not here to say that Mr. Madrigal—that we shouldn't be protected from him. There's no doubt about what he did, the outrageous nature of it. You've returned your verdict. I told you in the opening that we accept it, and we're not arguing with it." Tr. Vol. XIII (Mitigation & Sentencing) at 220. He says that this statement conflicts with Klucas' later instruction to the jury that they could consider any residual doubt that they had about Madrigal's guilt in mitigation. Tr. Vol. XIII (Mitigation & Sentencing) at 228–29.

Madrigal did not raise this claim on direct appeal. Therefore, it is procedurally barred. *State v. Perry*, 10 Ohio St.2d 175, 226 N.E.2d 104 (1967).

## PROSECUTORIAL MISCONDUCT CLAIM

L. Claim 12: Prosecutorial Misconduct

With his twelfth claim, Madrigal contends that the prosecutor violated due process when she made statements regarding future dangerousness to the jury at the mitigation stage. During closing statements, the prosecutor argued:

Is he dangerous? You bet he is.

. . .

He is a dangerous criminal by choice. Everything that has been done has been his choice. Tr. Vol. XIII (Mitigation & Sentencing) at 241–242. Madrigal contends that these statements amounted to impermissibly arguing a non-statutory aggravating factor.

The state appellate court denied Madrigal's claim. It concluded that the prosecution raised the issue of future dangerousness solely as a response to Madrigal's counsel's attempt to have good behavior in prison considered as a mitigating factor. Vol. VIII, Ex. 31 at 493–494.

The Court decides whether the decision of the state appellate court was an unreasonable application of *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

"The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). "[P]rosecutors must enjoy considerable latitude in presenting arguments to a jury, and that reversal of a conviction should not be ordered when a prosecutor's behavior, even though inappropriate, has not resulted in prejudicial error." *Sizemore v. Fletcher*, 921 F.2d 667, 670 (6th Cir.1990).

In evaluating whether a prosecutor's remarks rise to the level of a constitutional violation, courts must examine those remarks in the context of entire trial. *Ramseur v. Beyer*, 983 F.2d 1215, 1239 (3rd Cir.1992). The remarks must be sufficiently prejudicial in the context of the entire trial to violate a petitioner's due process rights. *Greer v. Miller*, 483 U.S. 756, 766, 107 S.Ct. 3102, 97 L.Ed.2d 618 (1987) (citation omitted).

Madrigal's argument does not persuade the Court. First, the prosecutor's remarks do not constitute misbehavior. The Supreme Court of Ohio has held that similar statements regarding future dangerousness made at the mitigation stage were not unconstitutional. *See State v. Wiles*, 59 Ohio St.3d 71, 89, 571 N.E.2d 97, 119 (1991); *State v. Beuke*, 38 Ohio St.3d 29, 33, 526 N.E.2d 274 (1988). In *Beuke*, the court held that:

While requiring the jury through instruction or specification to review a non-statutory aggravating circumstance such as "future dangerousness" would constitute reversible error under *State*

*v. Johnson,* 24 Ohio St.3d 87[, 494 N.E.2d 1061] (1986), merely arguing such in summation, coupled with a proper jury instruction explaining the statutory aggravating circumstances and mitigating factors, does not create a nonstatutory aggravating circumstance.

*State v. Beuke,* 38 Ohio St.3d 29 at 33, 526 N.E.2d 274.

Even if the comments were improper, the comments in the context of the entire trial do not rise to the level of a constitutional violation. The trial court properly instructed the jury on the statutory aggravating factors and possible sentences under Ohio law. Therefore, the state's isolated comments about future dangerousness and possible sentencing considerations did not deny Madrigal due process.

## OTHER ALLEGED CONSTITUTIONAL VIOLATIONS

Madrigal sets forth other alleged constitutional violations in claims 13–15. The Court examines each argument below.

M. Claim 13: Constitutionality of Ohio's Death Penalty Statutory Scheme

Madrigal claims that Ohio's death penalty statutes violate the Fifth, Sixth, Eighth, Ninth, and Fourteenth Amendments to the U.S. Constitution. Madrigal raises several arguments to support his claim.

The Ohio Supreme Court rejected Madrigal's challenge to the constitutionality of Ohio's death penalty statutes. The Court determines whether the Ohio Supreme Court's denial of this claim is contrary to or an unreasonable application of clearly established federal law.

The Ohio Supreme Court reasonably rejected Madrigal's constitutional claim. Madrigal was unable to identify with any particularity specific flaws in Ohio's death penalty statutes or any authority to support his allegations. That Madrigal's allegations lack specificity and direct supporting authority is no surprise, because federal courts have consistently rejected Madrigal's constitutional arguments.

The Court addresses each argument in turn.

### Prosecutorial Discretion

■ Madrigal argues that Ohio's death penalty statutory scheme gives prosecutors unbridled discretion in determining who will be charged with the death penalty. However, Madrigal does not allege with specificity any improper motive. The Supreme Court has stated that a prosecutor's discretion in charging a defendant with a capital crime does not violate the Constitution. *See Gregg v. Georgia,* 428 U.S. 153, 199, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976). Additionally, the Sixth Circuit has likewise explained that prosecutorial discretion in making charging decisions is an inherent part of the criminal justice system. *See United States v. Talbot,* 825 F.2d 991, 999 (6th Cir.1987).

### Aggravating Circumstances at the Guilt Phase

■ Madrigal also says that "duplication" of the underlying offense of felony murder as an aggravating circumstance violates the Eighth Amendment. The Supreme Court rejected this claim in *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). In *Lowenfield,* one of the aggravating circumstances found by the jury in its sentencing decision and upheld by state courts, was identical to an element of the underlying offense. The *Lowenfield* court held that this "duplication" did not violate the Eighth Amendment. It reasoned that the requirement that a capital sentencing scheme narrow the class of persons eligible for the death penalty may be "performed by jury findings at either the sentencing phase of the

trial or the guilt phase." *Lowenfield*, 484 U.S. at 244–45, 108 S.Ct. 546.

Here, one of the aggravated circumstances that applied to Madrigal was that he had committed an aggravated murder while in the commission of an aggravated robbery as proscribed under Ohio Revised Code Section 2929.04(A)(3). This is a legislative narrowing. *Coe v. Bell*, 161 F.3d 320, 350 (6th Cir.1998). Accordingly, this claim is without merit.

### Criminal Rule 11(C)(3)

■ Madrigal complains that Ohio Criminal Rule 11(C)(3) increases the likelihood of guilty pleas. By vesting the trial judge with the discretion to dismiss the death specifications "in the interest of justice" when defendants plead guilty, Madrigal argues that Rule 11(C)(3) of the Ohio Rules of Criminal Procedure encourages defendants to plead guilty and forego their right to a jury trial. *See* Ohio R.Crim. P. 11(C)(3) ("With respect to aggravated murder.... [i]f the indictment contains one or more specifications, and a plea of guilty ... is accepted, the court may dismiss the specifications and impose sentence accordingly, in the interest of justice.").

In reviewing Madrigal's appeal, the Ohio Supreme Court noted that here, the state offered no plea and Madrigal did not accept any plea. Further, even in cases in which a defendants pleads guilty, the provisions of Rule 11(C)(3) do not necessarily provide an advantage. A defendant who pleads guilty under this rule is not shielded from the death penalty. Rule 11(C)(3) states that, if the court does not dismiss the specifications, then a panel of three judges shall determine whether the offense was aggravated murder. Upon determining the offense to be aggravated murder, the three judges then must weigh the aggravating and mitigating circumstances, in much the same way a jury would balance their relative weight. Additionally, in

*State v. Buell*, 22 Ohio St.3d 124, 489 N.E.2d 795 (1986), the Ohio Supreme Court explicitly rejected the petitioner's argument that Rule 11(C)(3) encouraged guilty pleas and thereby waived a petitioner's fundamental rights. *See id.* at 138, 489 N.E.2d at 808. In *State v. Buell*, the court found Rule 11(C)(3) constitutional because "in Ohio, a sentence of death is possible whether a defendant pleads guilty to the offense or is found guilty after trial." *Id.*

In sum, the state did not offer Madrigal a plea and he did not accept any plea. Further, Madrigal does not cite clearly established federal law that prohibits states from allowing a judge to dismiss capital specifications if the defendant enters a plea of guilty or no contest.

Therefore, the Court rejects this argument.

### Conscious Desire To Kill

■ Madrigal claims that the Ohio death penalty statutory scheme is unconstitutional because it does not require either the conscious desire to kill or premeditation and deliberation as the culpable mental state.

The federal constitution does not require a conscious desire to kill or premeditation before the imposition of capital punishment. *Blystone v. Pennsylvania*, 494 U.S. 299, 110 S.Ct. 1078, 108 L.Ed.2d 255 (1990); *Tison v. Arizona*, 481 U.S. 137, 158, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987).

Therefore, the Court rejects this argument.

### Ohio Rev.Code Ann. Section 2929.03(D)(1)

■ Madrigal challenges section 2929.03(D)(1)'s requirement that the court submit to the sentencer any pre-sentence report that the defendant requests, even if the report contains prejudicial or irrelevant and inadmissible material. Under

section 2929.03(D)(1) of the Ohio Revised Code, a defendant may choose to have a presentence report prepared. *See* Ohio Rev.Code § 2929.03(D)(1). If requested, the report is automatically sent to the fact finder.

A defendant, however, need not request this report if he is concerned about the prejudicial effect this report may have on the fact finder. Madrigal presents no authority holding that requiring the submission of the report to the fact finder violates the constitution. In contrast, the Ohio Supreme Court found the provisions of section 2929.03 to be constitutional. *See Buell,* 22 Ohio St.3d at 138, 489 N.E.2d at 808 (regarding the option of the defendant to request a presentence report and the mandate that the report be submitted to the fact finder once requested, "[t]here is no constitutional infirmity in providing the defendant with such an option"). Accordingly, the Court rejects this argument.

### Only Appropriate Penalty

■ Madrigal contends that Ohio's capital statutory scheme is unconstitutional because it does not require the state to prove either the lack of mitigating factors or that death is the only appropriate penalty in a particular case. The federal constitution does not require that the state prove that death is the only appropriate punishment. It also does not require the state to prove the lack of mitigating factors. Instead, the federal constitution mandates the channeling of the sentencer's discretion and the consideration of any relevant mitigating evidence. *Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (plurality); *Eddings,* 455 U.S. at 110, 102 S.Ct. 869. Additionally, the Supreme Court has held that a state law which places the burden of proving mitigating factors on the defendant is not *per se* unconstitutional:

> So long as a state's method of allocating the burdens of proof does not lessen the

state's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for lenience.

*Walton v. Arizona,* 497 U.S. 639, 650, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), *overruled on other grounds by Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) (overruling *Walton* to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty).

Ohio's death penalty statutes do not lessen the state's burden to show that aggravating circumstances outweigh any mitigating factors.

### Proper & Consistent Weighing of Aggravating & Mitigating Circumstances

■ Madrigal also argues that Ohio's death penalty scheme violates the Constitution because it does not establish a standard by which to identify and balance appropriate mitigating factors. The Supreme Court has held that "the Eighth Amendment does not require States to adopt specific standards for instructing juries on mitigating circumstances." *Buchanan v. Angelone,* 522 U.S. 269, 274, 118 S.Ct. 757, 139 L.Ed.2d 702 (1998). Therefore, the absence of instructions or particularly defined standards to evaluate the existence and balance the relative weight of mitigating circumstances does not render a statutory scheme unconstitutional. *See id.* at 279, 118 S.Ct. 757; *State v. Goff,* 82 Ohio St.3d 123, 130–31, 694 N.E.2d 916, 923 (1998).

*Defendant's Burden to Prove Mitigation*

Madrigal objects to the fact that Ohio's death penalty scheme places the burden to prove mitigating factors on the defendant. The Supreme Court has held that a state law which places the burden of proving mitigating factors on the defendant is not *per se* unconstitutional:

> So long as a state's methods of allocating the burdens of proof does not lessen the state's burden to prove every element of the offense charged, or in this case to prove the existence of aggravating circumstances, a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency.

*Walton v. Arizona,* 497 U.S. 639, 650, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990).

Ohio's death penalty statutes do not lessen the state's burden to show the existence of aggravating circumstances that outweigh the existence of any mitigating factors. Therefore, the Court rejects this claim.

*No Consideration of Sympathy or Mercy*

 Next, Madrigal asserts that the Ohio death penalty statutes impermissibly stop consideration of sympathy and mercy. Ohio law does not contain an anti-mercy requirement. *California v. Brown,* 479 U.S. 538, 541, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987). However, Ohio law does not mandate that a trial court give a mercy instruction. *Mapes,* 171 F.3d at 415–16.

*Mandatory Death Penalty*

 Madrigal argues further that the Ohio death penalty scheme is unconstitutional because it is impermissibly mandatory. He says, that by foreclosing the sentencing body's authority to return a life sentence unless aggravating factors fail to outweigh the mitigating factors, Ohio's statutes violate the Eighth and Fourteenth Amendments by creating a mandatory death penalty. Ohio law, however, does not provide for the automatic imposition of the death penalty for persons convicted of a particular crime. Rather, Ohio's sentencing scheme merely provides for the imposition of the death penalty when the aggravating circumstances of a particular crime outweigh any mitigating factors. This approach does not offend the Constitution. *See Buell v. Mitchell,* 274 F.3d 337, 368 (6th Cir.2001) (upholding the imposition of the death penalty when a jury and the reviewing courts specifically considered the aggravating and mitigating circumstances and finding that "[b]y weighing these specific considerations, it cannot be said that a mandatory death penalty was imposed . . .").

*Failure to Require Sentencing Jury to Identify Mitigating Factors Found*

 Madrigal claims that the Ohio capital sentencing system prevents meaningful appellate review because it does not require the sentencing jury to identify mitigating factors found. The Ohio Supreme Court had previously rejected this argument. *See State v. Jenkins,* 15 Ohio St.3d 164, 473 N.E.2d 264 (1984). The court in *Jenkins* held that:

> The fundamental purpose behind proportionality review is to ensure that sentencing authorities do not retreat to the pre-*Furman* era when sentences were imposed arbitrarily, capriciously and indiscriminately. To achieve this result, state courts traditionally compare the overall course of conduct for which a capital crime has been charged with similar courses of conduct and the penalties inflicted in comparable cases.

*Id.* at 176–177, 473 N.E.2d 264. It further held that "such information is not an indispensable ingredient in assisting us to determine whether the imposition of a death

sentence is disproportionate to sentences imposed for similarly proscribed courses of conduct." *Id.* at 177, 473 N.E.2d 264. This is neither contrary to nor an unreasonable application of federal law as established in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Therefore, the failure to require the sentencing jury to identify mitigating factors found is not unconstitutional.

### Proportionality Review

■ Madrigal claims that the Ohio death penalty statutes fail to provide an adequate appellate proportionality review. The U.S. Supreme Court has held that the Constitution does not require a proportionality review of death sentences. *See Pulley v. Harris,* 465 U.S. 37, 50–51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Therefore, any inadequacy in a state-provided proportionality review, even if proven, does not entitle a petitioner to federal habeas relief.

### Proportionality Review Limited to Cases Where Death Penalty Has Been Imposed

This claim is also noncognizable. The U.S. Supreme Court has held that the Constitution does not require a proportionality review of death sentences. *See Pulley v. Harris,* 465 U.S. 37, 50–51, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984). Therefore, any inadequacy in a state-provided proportionality review, even if proven, does not entitle a petitioner to federal habeas relief.

### Evolving Standards of Decency

■ Madrigal argues that Ohio's death penalty scheme violates the Constitution because it fails to comport with "the evolving standards of decency that mark the progress of a maturing society." *Trop v. Dulles,* 356 U.S. 86 at 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). The Supreme Court in *Gregg* rejected this argument, finding that, subsequent to its decision in *Furman,* at least thirty-five state legislatures enacted new death penalty statutes, a statewide

referendum in California adopted a constitutional amendment authorizing capital punishment, and that juries, a "significant and reliable objective index of contemporary values," had continued to impose the death penalty. *See Gregg,* 428 U.S. at 179–182, 96 S.Ct. 2909.

### Due Process

■ Next, Madrigal contends that Ohio's death penalty scheme violates the constitution because it is not the least restrictive means of achieving state interests, and additionally, Ohio has not demonstrated any compelling state interests for the use of the death penalty. The Supreme Court in *Gregg* rejected this argument, finding that the death penalty serves compelling state interests and is not "invariably disproportionate to the crime" of murder. *See Gregg,* 428 U.S. at 183, 187, 96 S.Ct. 2909; *see also Jenkins,* 15 Ohio St.3d at 168, 473 N.E.2d at 272–73 (rejecting the argument that Ohio's death penalty statutes are unconstitutional because they do not employ the least restrictive means possible to achieve a compelling interest).

### International Law & Treaties

■ Finally, Madrigal alleges that Ohio's capital punishment system violates international law and treaties. Specifically, he claims that the imposition of the death penalty violates the Charter of the American States ("the OAS") and the United Nations Charter.

Although the U.S. Supreme Court has not directly addressed the issue, it has implicitly rejected an argument that international law should influence rulings under the federal constitution about the death penalty. In *Stanford v. Kentucky,* 492 U.S. 361, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989), the Court held that imposing the death penalty on sixteen-year-olds does not violate the Eighth Amendment. *Id.*

Although the Court did not expressly say so, it appeared to implicitly reject the dissent's reliance on international treaties that banned the death penalty. *See State v. Twyford,* Jefferson App. No. 93–J–13, unreported (Sept. 25, 1998); *State v. Williams,* Butler App. Nos. CA91–04–060, CA92–06–110, 1992 WL 317025, unreported (Nov. 2, 1992).

Finally, at least one federal district court has held that the death penalty does not violate international law. *Jamison v. Collins,* 100 F.Supp.2d 647, 766–767 (S.D.Ohio 2000) (reviewing the OAS, customary international law, and other international human rights treaties and concluding "that international law does not preclude the State of Ohio from establishing and carrying out a capital punishment scheme.")

### N. Claim 14: Proportionality Review

With Claim 14, Madrigal contends that the judgment and sentence against him are constitutionally infirm because he says the Ohio appellate courts failed to conduct an adequate proportionality review.

The Ohio Supreme Court addressed Madrigal's claims on the merits and determined that it lacked merit.

The Court finds the state courts' rejection of Petitioner Madrigal's proportionality review claim to be reasonable. Madrigal is entitled to habeas relief only if he shows a violation of the Constitution or of federal law. *See Estelle,* 502 U.S. at 67–68, 112 S.Ct. 475. However, the U.S. Supreme Court has held that the Constitution does not require a proportionality review of death sentences. *See Pulley,* 465 U.S. at 50–51, 104 S.Ct. 871. Therefore, any inadequacy in a state-provided proportionality review, even if proven, does not entitle a petitioner to federal habeas relief. As the Supreme Court made clear in *Pulley,* a claim of inadequate proportionality review, "even if accurate, would not warrant issuing a writ of habeas corpus. Rather it would appear to be a matter that the state courts should consider, if they are so inclined, free of the constraints of the federal writ." *Id.* at 42, 104 S.Ct. 871.

Therefore, the Court rejects Claim 14.

### O. Claim 15: Freestanding Actual Innocence Claim

Having found that Madrigal procedurally defaulted Claim 15, the Court does not reach the merits of this issue.

### VI. Conclusion

For the reasons discussed above, the Court denies the writ except for Claim 1. In reviewing Claim 1, the Court finds that the admission of co-defendant Chris Cathcart's statements that implicated Madrigal as the killer "had a substantial and injurious effect or influence in determining the jury's verdict." Accordingly, the Court grants the petition for habeas corpus as to Claim 1.

IT IS SO ORDERED.

### JUDGMENT

This Court has issued it Memorandum Opinion and Order in the above case. The Court conditionally grants Petitioner Madrigal's habeas corpus petition as to Claim 1. The State must retry Petitioner Madrigal or release him from custody within 200 days of the date of this order. If the State fails to take such action, this Court shall consider the issuance of an additional writ unconditionally releasing Petitioner from state custody. The Court denies the petition as to all other claims.

Further, this Court certifies, pursuant to 28 U.S.C. § 1915(a) and *Murphy v. Ohio,* 263 F.3d 466 (6th Cir.2001), that, for the reasons stated in the Court's opinion, an appeal by Petitioner Madrigal from this decision could not be taken in good faith except with respect to Claim 4. Other than

Claim 4 (unanimity jury instruction), there is no basis upon which to issue a certificate of appealability. *See* U.S.C. § 2253(c); Federal Rule of Appellate Procedure 22(b).

Should the State appeal this decision to the United States Court of Appeals for the Sixth Circuit, this order is stayed pending the disposition of that appeal.

Accordingly, this action is terminated under Federal Rule of Civil Procedure 58.

IT IS SO ORDERED.